**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRYAN SCHOENGOOD, ANNETTA KING SIMPSON and WILLIE ROLAND, | Civil Action No.: cv-20-2022 |
| Individually and on behalf of all others similarly situated, | |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR DECLATORY JUDGMENT AND INJUCTIVE RELIEF** |
| -against- | |
| HOFGUR LLC D/B/A QUEENS ADULT CARE CENTER, and GEFEN SENIOR CARE GROUP, | |
| Defendants. | |

Bryan Schoengood, Annetta King Simpson, and Willie Roland (sometimes collectively "Plaintiffs"), on behalf of themselves and others similarly situated, and by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP, upon information and belief, state and allege as follows:

**PRELIMINARY STATEMENT**

1.     Plaintiffs bring this action against Defendants Hofgur, LLC d/b/a Queens Adult Care Center and Gefen Senior Care Group (sometimes collectively "Defendants") on behalf of individuals with disabilities residing in Defendants' assisted living facility for declaratory and injunctive relief to stop Defendants' unlawful practices under Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.* and § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. §§ 701 *et seq*.

2.     Plaintiffs seek declaratory and injunctive relief (a) directing that the Defendants immediately comply with the applicable regulations and guidelines governing long-term care

facilities with regard to the control and mitigation of coronavirus disease, and (b) appointing a Special Master at Defendants' cost to chair a committee to evaluate, oversee, manage, advise, and direct ameliorative action for the residents of Defendants' assisted living facility, who are particularly vulnerable to contracting and suffering dire consequences from the coronavirus..

3.      Hofgur, LLC d/b/a Queens Adult Care Center ("QACC") is an adult care home located at 80-08 45th Avenue, Elmhurst NY 11373. The facility is publicly marketed as a home for old, sick, or mentally ill New York residents. Out of approximately 350 total beds available at the facility, 200 are specifically designated as assisted living program beds.[1]

4.      Plaintiffs are elderly or dependent individuals with disabilities and associated significant care needs who reside at QACC. Plaintiffs and the class they seek to represent chose to stay at QACC because they have physical or mental impairment that substantially limits one or more major activities of daily living including, but not limited to, assistance with managing and taking medication, housekeeping, laundry, dressing, bathing, toileting, hygiene, food preparation, and transportation.

5.      Plaintiffs are entitled to the assisted living services at QACC because of their conditions that are defined as disabilities by the government and the Defendants. As stated in the New York State Guide to Medicaid Coverage for Assisted Living Benefits:

> Applicants **must be medically eligible for nursing home care**. However, their functional ability cannot be so limiting that they require nursing home care around the clock.

*See* Ex. D, Declaration of Philip McCallion, PhD, ACSW, dated May 3, 2020 ("McCallion Decl."), ¶ 11. In addition, New York State Department of Health defines Assisted Living Program as provision of "personal care, room, board, housekeeping, supervision, **home health aides**, personal emergency response services, **nursing,** physical therapy, occupational therapy, speech therapy,

---

[1] https://profiles.health.ny.gov/acf/view/1255101

**medical supplies and equipment, adult day health care,** a range of **home health services**, and the **case management services of a registered professional nurse**."[2] McCallion Decl., ¶ 11. New York State Social Security program follows the same definition in providing coverage.[3]

6.     Upon information and belief, the majority of QACC's residents receive assisted living benefits under these or equivalent provisions. Furthermore, a high number of these residents suffer specific mental health psychiatric disabilities requiring assistance as well as guidance and support with activities of daily living. Upon information and belief, approximately two-thirds of the residents of QACC suffer from mental illness or are regarded as such. *See* Ex. A, Declaration of Plaintiff Annetta King Simpson, dated May 1, 2020 ("Simpson Decl."), ¶ 2. Without proper guidance and support, they pose an infectious disease risk to themselves and all others at the facility.

7.     Since the coronavirus first made its way into QACC in mid- or late- March 2020, Plaintiffs and the proposed class members have experienced and witnessed QACC's gross failure to provide the most basic level of care to safeguard their health and safety in the context of a global health pandemic. People with disabilities are exposed to high risks of contracting the virus with no or few preventative measures in place. Residents who fall sick are left to languish in their room without proper access to medical care. As set forth below, permitting such substandard conditions in an assisted living facility that primarily houses disabled individuals with physical or mental impairment constitutes violation of Title III of the ADA and § 504 of the RA.

8.     New York City is the epicenter of the country's struggle with the COVID-19 virus and the resulting coronavirus disease ("COVID-19"). As this disease ravages the City, infecting

---

[2] https://www.health.ny.gov/health_care/medicaid/program/longterm/alps.htm
[3] https://www.ahcancal.org/ncal/advocacy/regs/State%20Reg%20Review%20%20State%20Summaries/New%20York.pdf

more than 174,000 and killing close to 14,000 City residents to date, the risks posed by COVID-19 to people in adult homes – in terms of transmission, exposure, and harm – are stark and alarming. *See* Ex. E, Declaration of Richard Martinello, M.D., dated May 4, 2020 ("Martinello Decl."), ¶ 7. Residents are packed in a combustible mix of sick and elderly patients alongside those with mental illness, often with little understanding of the risks and danger of this highly contagious disease. For reasons beyond their control, people in assisted living facilities are unable to voluntarily practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for sanitation, cleaning, or laundry, avoid high-touch surfaces, or sanitize their own environment.

9.      QACC is one of the largest assisted living facilities in the State of New York.[4] It is crowded with as many as 352 New York residents who are aging, mentally ill, or otherwise in poor health. Residents are vulnerable and susceptible to the risks of COVID-19 because they are likely to have chronic underlying health conditions, such as chronic obstructive pulmonary disease, other chronic lung diseases, diabetes, heart disease, and asthma. McCallion Decl., ¶ 12. Moreover, because of their physical or mental impairments, residents have limited capacity to access or seek medical care, to absorb the severity of COVID-19, and to understand the importance of self-awareness and the need to stay indoors in the context of COVID-19.

10.      The outbreak of a highly infectious, deadly virus in an assisted living facility setting is a disaster, calling for urgent and decisive action to protect the health of those residing in the home, those who work there, the medical professionals who will treat those who become infected, and the members of the surrounding community.

---

[4] *See, e.g.*, *Disabiilty Advocates v. Paterson*, 1:03-cv-03209 (E.D.N.Y.)

11.     Since March 22, 2020, when news media articles began to publicize accounts of COVID-19 infection and deaths in QACC,[5] the number of residents and staff who have fallen ill or dead has multiplied. The coronavirus is spreading in the facility, fast.

12.     Nevertheless, QACC has failed or refused to put cleanliness and sanitary measures in place, to adequately screen for the virus in its residents and staff, to enforce social distancing among residents, or to properly isolate residents suspected as having COVID-19. Simpson Decl., ¶ 4. The majority of QACC's residents, many of whom are mentally ill, are still allowed to wander freely through the facility's three floors, recreational rooms, and communal rooms, and outside to the surrounding Elmhurst neighborhood. Simpson Decl., ¶ 5. Medical care and treatment within QACC are highly limited in capacity, and as staff become sick or refuse to care or offer assistance to those residents who fall sick, even fewer people are present to care for those residents who remain in the facility. Simpson Decl., ¶ 4.

13.     Title III of the ADA imposes affirmative duties upon Defendants to make their assisted living facilities accessible to disabled residents. In the context of COVID-19 pandemic and the particular vulnerability of disabled residents, ADA requires Defendants to make reasonable modifications to their policies, practices, and procedures to protect their residents by implementation of an effective infectious disease control and prevention program.

14.     Similarly, § 504 of the RA, 29 U.S.C. § 794, provides that no person with a disability shall: "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Under information and belief, QACC qualifies as a program or

---

[5] Joaquin Sapien, *Now That Coronavirus Is Inside This Adult Home for the Elderly or Mentally Ill, It May Be Impossible to Stop*, ProPublica (Apr. 2, 2020), https://www.propublica.org/article/now-that-coronavirus-is-inside-this-adult-home-for-the-elderly-or-mentally-ill-it-may-be-impossible-to-stop

activity receiving Federal financial assistance as its programs and activities are financed by Medicare and Medicaid among other federal programs.

15.     In violation of these laws, Defendants have failed to respond to the urgent and serious threat to the health of elderly or dependent residents within their facility. Although many residents and staff members have been infected with the virus, Defendants have failed to take measures appropriate for a public health crisis such as prompt and strict compliance with applicable regulations and guidelines with regard to the control and prevention of COVID-19 in their facility. These regulations and guidelines include those of the Centers for Disease Control and Protection ("CDC"), the Department of Health & Human Services Centers for Medicare & Medicaid Services ("CMS"), federal regulations for states and long-term care facilities including 42 C.F.R. § 483, as well as New York Public Health Law governing long term care facilities, nursing homes, and/or assisted living facilities. Defendants' policy and practice of failing to follow the applicable infection control regulations and guidelines violates the ADA and RA by making their facility inaccessible and unusable by persons with disabilities.

16.     In violation of the ADA and RA, Defendants have failed to make reasonable modifications to their policies, practices, and procedures that are necessary for persons with disabilities to have full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages, and accommodations purportedly provided by QACC, including the most basic level of promised care which is to safeguard the health and safety of its residents.

17.     The prevention of the acquisition of a potentially deadly/disabling communicable disease, such as COVID-19, is a duty of the facility. Martinello Decl., ¶ 8. During this critical time when healthcare institutions of all sizes across the U.S. and the world are adapting to ensure safety, Defendants have failed to make modifications to QACC's policies and procedures to protect its

vulnerable residents in direct contravention of the ADA and RA as well as the instructive guidelines from the CDC, CMS, and regulations such as 42 C.F.R. § 483. Martinello Decl., ¶ 8.

18.     Defendants are receiving federal funding for certain programs and activities that are supposed to inure to the benefit of individuals with disabilities, but in fact, QACC is not providing the benefits and services that were promised to its disabled residents to receive effective care and assisted living services.

19.     Plaintiffs Bryan Schoengood, Annetta King Simpson, and Willie Roland are three (3) of the approximately 350 residents of QACC, who face an imminent risk of serious injury or death if exposed to COVID-19 because of their disabilities. Defendants are grossly ill-equipped to identify, monitor, and treat a COVID-19 epidemic. The combination of an infectious disease epidemic striking a facility that houses 352 people with various underlying medical conditions is likely to result in serious illness and death, if residents remain there at current population levels and under current conditions.

20.     This lawsuit seeks to avoid real, imminent, and irreparable harm to the health of Plaintiffs and similarly situated vulnerable individuals. This action seeks to require that Defendants immediately and strictly follow the applicable regulations and guidelines from CDC, CMS, 42 C.F.R. § 483, and Public Health Law in providing services, goods, privileges, advantages and accommodations to QACC's residents. Further, this action seeks to appoint an expert Special Master at Defendants' cost to chair COVID-19 investigation to evaluate and oversee Defendants and their staff's treatment and care of QACC's residents and to make recommendations for ameliorative action. These measures are necessary in order to make QACC readily accessible to and usable by persons with disabilities as required by the ADA and § 504 of the RA.

21.     Now is the time to act to stop the spread of COVID-19 to disabled residents at QACC and to protect them and the broader community from the serious risk to their health and safety. Plaintiffs have no adequate remedy at law and, unless Defendants are preliminarily and permanently enjoined, Plaintiffs will continue to suffer real, imminent, and irreparable harm as a result of being denied full and equal access to and enjoyment of QACC's goods, services, facilities, privileges, advantages, and/or accommodations. Plaintiffs seek declaratory and injunctive relief as set forth below and recovery of reasonable attorneys' fees, costs, and litigation expenses available under the law.

## BACKGROUND

22.     Though they were not required to do so, Plaintiffs notified the ombudsman from New York State Department of Health of QACC's violations of Title III of the ADA and their intention to file this lawsuit. The ombudsman's office is tasked with investigating and resolving residents' complaints regarding long-term care facilities such as QACC.

23.     Upon information and belief, Defendants have been under investigation by the ombudsman's office relating to possible misappropriation of funds they received from New York State under the Enhancing the Quality of Adult Living ("EQUAL") Program in that the Defendants may have used the funds improperly, including for their facility's renovation, rather than for resident care as they were required to do. Upon information and belief, under Governor Cuomo's Executive Order regarding the COVID-19 pandemic,[6] New York State's Long-Term Care Ombudsman Program has been deemed "non-essential," and therefore the ombudsman's office is no longer allowed to perform onsite inspections or enter QACC at this time.

---

[6] *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order*, New York State (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order

24.     The limited oversight available during the course of the pandemic and Defendants' tendency to disregard resident care directives urges immediate judicial intervention including appointment of a Special Mater on an emergency basis to protect QACC's residents and the surrounding community from imminent, serious, and irreparable risk to their health and safety.

## JURISDICTION AND VENUE

25.     This court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(4). The Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*. and § 504 of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq*, present federal questions and confers jurisdiction on this Court over Plaintiffs' claims regardless of the amount in controversy

26.     In addition, the Court has jurisdiction to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

27.     Defendants are subject to personal jurisdiction and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial portion or the acts or omissions upon which this action is based occurred and continue to occur in this District within the County of Queens.

## JURY DEMAND

28.     Plaintiffs demand a jury trial on all issues so triable.

## PARTIES

29.     Plaintiff Bryan Schoengood ("Mr. Schoengood") is a 61-year-old man who resides in QACC. At all times relevant to this Complaint, Mr. Schoengood was a qualified person with disabilities within the meaning of the ADA and the RA. Mr. Schoengood has been diagnosed with paranoid schizophrenia, which qualified him as a resident of QACC for his mental health needs and assistance. Mr. Schoengood requires continuous care and assistance with basic activities of daily living including but not limited to housekeeping, laundry, dressing, bathing, managing

medications, toileting, and transportation. Mr. Schoengood has been a resident of QACC for approximately 31 years. Mr. Schoengood's roommate at the facility was one of the first to be infected with the coronavirus and subsequently died from it.

30. Plaintiff Annetta King Simpson ("Ms. Simpson") is a 64-year-old woman who resides in QACC. At all times relevant to this Complaint, Ms. Simpson was a qualified person with disabilities within the meaning of the ADA and the RA. Ms. Simpson suffers from chronic and severe cardiovascular disease, with a history of prior myocardial infarction, six (6) stents of major cardiac vessels, as well as diabetes and hypertension. These conditions qualified her as a resident of QACC for her medical needs and assistance. Ms. Simpson requires continuous care and assistance with basic activities of daily living including but not limited to housekeeping, laundry, dressing, bathing, managing medications, toileting, and transportation. Ms. Simpson has been a resident of QACC for approximately two (2) years. Ms. Simpson was one of the residents who became severely ill from coronavirus. She was hospitalized at an external medical facility and was discharged back to QACC.

31. Plaintiff Willie Roland ("Mr. Roland") is an 82-year-old man who resides in QACC. At all times relevant to this Complaint, Mr. Roland was a qualified person with disabilities within the meaning of the ADA and the RA. Mr. Roland suffers from chronic obstructive pulmonary disease and diabetes, has a cardiac valve pump, and is legally blind. These conditions qualified him as a resident of QACC for his medical needs and assistance. Mr. Roland requires continuous care and assistance with basic activities of daily living including but not limited to housekeeping, laundry, dressing, bathing, managing medications, toileting, and transportation. Mr. Roland has been a resident of QACC for approximately 15 years. Mr. Roland was one of the residents who became severely ill from coronavirus. Upon information and belief, for

approximately two and a half weeks after testing positive for coronavirus, Mr. Roland did not receive any care or assistance from the QACC's staff before he was rescued by his daughter and brought to a hospital for treatment. Once he is discharged, he will be returning to QACC due to his disabilities and significant care needs.

32.     Plaintiffs are pursuing this action to protect and advocate for the rights and interests of themselves as well as other QACC residents with qualifying disabilities under the meaning of the ADA during the course of COVID-19 pandemic. Plaintiffs and members of the proposed class have physical or mental impairments that substantially limit one or more major life activities, have a record of such impairments that qualified them to receive Defendants' services at QACC, and are regarded as having such impairments. Therefore, they are entitled to protection under the ADA and RA as individuals with disabilities.

33.     Upon information and belief, Defendant Hofgur, LLC d/b/a Queens Adult Care Center is a corporation organized under the laws of the State of New York with its principal place of business located at 80-08 45th Avenue, Elmhurst NY 11373.

34.     Upon information and belief, Defendant Gefen Senior Care Group is a corporation organized under the laws of the State of New York with its principal place of business located at 2830 Pitkin Boulevard, Brooklyn NY 11208. In addition to QACC, it owns four other assisted living facilities throughout New York City.

35.     Defendants are responsible for and oversee the care and treatment provided at QACC's facility located at 80-08 45th Avenue, Elmhurst NY 11373. Approximately 350 people reside in the facility with designated beds. Defendants have adopted and enforced policies, practices, and procedures that leave Plaintiffs and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

36.     QACC is an assisted living facility that provides basic and personal care services to their residents. It is an entity covered by Title III of the ADA under the enumerated category of "senior citizen center […] or other social service center establishment." 42 U.S.C. § 12181(7)(K). It is an entity covered by § 504 of the RA as a program receiving Federal financial assistance.

## STATEMENT OF FACTS

### I.     The COVID-19 Health Crisis

37.     The novel coronavirus that causes COVID-19 has led to a global pandemic. Upon information and belief, as of May 3, 2020, there were more than 1.1 million reported COVID-19 cases in the United States and more than 67,000 deaths. The virus is known to spread easily from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.

38.     In many people, COVID-19 causes fever, cough, and shortness of breath. However, for people over the age of fifty or with pre-existing medical conditions that increase the risk of serious COVID-19 infection, these symptoms can be severe.[7] Upon information and belief, most people in higher risk categories who develop serious illness will need advanced and intensive support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.

39.     COVID-19 can cause severe damage to lung tissue, which requires an extensive period of intensive rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 can also can damage tissues in other vital organs, including the heart and

---

[7] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHOChina Joint Mission Report).

liver, thereby causing rapid and untimely deaths. For example, COVID-19 may target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure. COVID-19 may also trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.

40.     Dangerous complications from COVID-19 can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can rapidly deteriorate in as little as five days or sooner. Even younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation in order to prevent serious illness or death. The need for COVID-19 prevention, screening, diagnosis, and treatment is even more salient for the high-risk population including the elderly and those with underlying medical conditions. McCallion Decl., ¶ 12; Martinello Decl., ¶¶ 6-7.

41.     There is no vaccine against COVID-19. Upon information and belief, social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including frequently washing hands with soap and water, are the only available effective measures for protecting vulnerable people from COVID-19. Some experts expect the pandemic to last up to two (2) more years.[8]

---

[8]*See*, *e.g.*, Maggie Fox, *Expert report predicts up to two more years of pandemic misery*, CNN (May 1, 2020), https://www.cnn.com/2020/04/30/health/report-covid-two-more-years/index.html

## II.     Particular Vulnerability of Residents and Staff of Long-Term Care Facilities in New York City

42.     New York is currently at the epicenter of the coronavirus pandemic. Governor Cuomo declared a state of emergency in New York State on March 7, 2020. Mayor DeBlasio declared a state of emergency in New York City on March 12, 2020. These declarations remain in effect to date.

43.     Upon information and belief, as of May 3, 2020, there are over 300,000 positive cases in New York State with more than half of those cases being in New York City. Upon information and belief, to date, there have been 18,909 deaths from COVID-19 in New York State, with 13,538 of those deaths in New York City.

44.     People in congregate environments, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19. Martinello Decl., ¶ 7. People who require the services of assisted living facilities find it virtually impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission, without a carefully laid plan to prevent and control the spread of COVID-19. The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[9]

45.     On March 20, 2020, Governor Cuomo took a strict measure to fight the virus's spread, issuing a "stay at home" executive order for all residents. In a statement to the public, Governor Cuomo explained that the order prohibits non-essential gatherings of any size, requires all non-essential businesses to close and 100 percent of their employees to work from home, and recommends that people stay at least six (6) feet away from others.[10]

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html
[10] *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order*, New York State (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order.

46.     It is known that those who are older and those with underlying chronic medical conditions such as diabetes, chronic obstructive pulmonary disease, cardiac disease, are at highest risk for COVID-19. McCallion Decl., ¶ 12. The risk is further compounded when individuals live in congregate settings because of the potential for close contact. *Id.*

47.     The setting of long-term care facility increases the risk of contracting an infectious disease, such as COVID-19, due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with limited access to medical care. Martinello Decl., ¶ 7. Residents have varying levels of mental capacities, and therefore cannot autonomously stay at a distance from others without an effective quarantine guideline developed and enforced by the facility. Moreover, due to their physical ailments and/or mental illnesses, residents are often unable to advocate for enforcement of hygiene or quarantine protocols, for diagnostic screening of their or others' conditions, and for transfer to an external medical facility when the symptoms warrant such a transfer.

48.     Adult homes such as QACC in particular house large groups of people together, and move people in groups to eat, do recreation, and socialize. They frequently have insufficient medical care for the population, and, in times of crisis, even those medical staff cease coming to the facility or tending to the residents. Simpson Decl., ¶ 4. Residents are often not given appropriate protective gears or supplies such as masks, gloves, and gowns, and many of them are not capable of asking for these gears or understanding their importance because of their disabilities including mental illness. *Id.*, ¶ 5.

49.     High risk does not have to mean infection and mortality. McCallion Decl., ¶ 14. It is in the context of this health crisis that organizations such as CDC and CMS have published guidelines for infection control and prevention of COVID-19 in long-term care facilities including

nursing homes and/or assisted living facilities.[11] Martinello Decl., ¶ 8. These guidelines were devised to ensure the health and safety of the residents of these facilities, who are particularly vulnerable to COVID-19 due to the very conditions that qualify them to reside there.

50.     CDC has detailed the gravely serious threat posed to resident populations in nursing, assisted living, and long-term care facilities like QACC. CDC recommends that long-term care facilities act immediately to address asymptomatic and pre-symptomatic transmission, to implement source control for everyone entering the facility regardless of symptoms, and to dedicate an aera of the facility to care for residents with suspected or confirmed COVID-19 with an adequate staffing plan for that specific location. In addition, CDC specifically enumerates various guidelines and strategies such as:

1.  Keep COVID-19 from entering your facility:
    - Restrict all visitors except for compassionate care situations (e.g., end-of- life).
    - Restrict all volunteers and non-essential healthcare personnel (HCP), including consultant services (e.g., barber, hairdresser).
    - Implement universal use of source control for everyone in the facility.
    - Actively screen anyone entering the building (HCP, ancillary staff, vendors, consultants) for fever and symptoms of COVID-19 before starting each shift; send ill personnel home. Sick leave policies should be flexible and nonpunitive.
    - Cancel all field trips outside of the facility.

2.  Identify infections early:
    - Actively screen all residents daily for fever and symptoms of COVID-19; if symptomatic, immediately isolate and implement appropriate Transmission-Based Precautions.
        - Older adults with COVID-19 may not show typical symptoms such as fever or respiratory symptoms. Atypical symptoms may include new or worsening malaise, new dizziness, or diarrhea. Identification of these symptoms should prompt isolation and further evaluation for COVID-19.
    - Notify your state or local health department immediately (<24 hours) if these occur:

---

[11] *See, e.g.*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care.html; https://www.cms.gov/files/document/qso-20-14-nh-revised.pdf

- o Severe respiratory infection causing hospitalization or sudden death
- o Clusters (≥3 residents and/or HCP) of respiratory infection
- o Individuals with suspected or confirmed COVID-19

3. <u>Prevent spread of COVID-19</u>:
   - Actions to take now:
     - o <u>Cancel all group activities and communal dining.</u>
     - o <u>Enforce social distancing among residents.</u>
     - o <u>Ensure all residents wear a cloth face covering for source control whenever they leave their room or are around others</u>, including whenever they leave the facility for essential medical appointments.
     - o Ensure all HCP wear a facemask or cloth face covering for source control while in the facility. Cloth face coverings are not considered personal protective equipment (PPE) because their capability to protect healthcare personnel (HCP) is unknown. Cloth face coverings should NOT be worn instead of a respirator or facemask if more than source control is required.
   - <u>If COVID-19 is identified in the facility, restrict all residents to their rooms and have HCP wear all recommended PPE for care of all residents (regardless of symptoms) on the affected unit (or facility-wide depending on the situation). This includes: an N95 or higher-level respirator</u> (or facemask if a respirator is not available), eye protection, gloves, and gown. HCP should be trained on PPE use including putting it on and taking it off.
     - o This approach is recommended because of the high risk of unrecognized infection among residents. Recent experience suggests that a substantial proportion of residents could have COVID-19 without reporting symptoms or before symptoms develop.
     - o When a case is identified, public health can help inform decisions about testing asymptomatic residents on the unit or in the facility.

4. <u>Assess supply of personal protective equipment (PPE) and initiate measures to optimize current supply</u>:
   - If you anticipate or are experiencing PPE shortages, reach out to your state/local health department who can engage your local healthcare coalition.
   - Consider extended use of respirators, facemasks, and eye protection or prioritization of gowns for certain resident care activities.

5. <u>Identify and manage severe illness</u>:
   - Designate a location to care for residents with suspected or confirmed COVID-19, separate from other residents.

- Monitor ill residents (including documentation of temperature and oxygen saturation) at least 3 times daily to quickly identify residents who require transfer to a higher level of care.

*See Key Strategies to Prepare for COVID-19 in Long-term Care Facilities*, Center for Disease Control and Prevent, April 15, 2020 (emphasis added).[12]

51.     In addition to incorporating the CDC's recommendations outlined above, CMS recommends reinforcement of strong hand-hygiene practices, availability of tissues, no touch receptacles for disposal, and facemasks.[13] It also provides additional guidance which includes: "Cancel communal dining and all group activities, such as internal and external group activities. Implement active screening of residents and staff for fever and respiratory symptoms."

52.     42 C.F.R. § 483 sets forth federal regulations governing the quality of long-term care facilities such as QACC. 42 C.F.R. § 483.80 specifically governs the requirement for the facilities to have "an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable diseases and infections." These are the "the requirements that an institution must meet in order to qualify to participate as a Skilled Nursing Facility in the Medicare program, and as a nursing facility in the Medicaid program. They serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid."

53.     The New York State Department of Health provides New York Public Health Law § 415.12, which further provides that "Each resident shall receive and the facility shall provide the necessary care and services to attain or maintain the highest practicable physical, mental and

---

[12] https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care.html
[13] https://www.cms.gov/files/document/qso-20-14-nh-revised.pdf

psychosocial well-being, in accordance with the comprehensive assessment and plan of care subject to the resident's right of self-determination."

54.     For congregate settings, these guidelines require transparency in communications with residents and responsible family, training for staff, identification and use of space for quarantining and isolation, constant emphasis on preventive strategies, vigilance around spaces when individuals may congregate, use of masks and in infection cases, PPE, and attention to the potential that staff may themselves be infected and/or carriers. McCallion Decl., ¶ 14.

55.     As with other aspects of medical care, if the facility is unable to provide an aspect of necessary care, the facility has a duty to coordinate access to this care for their patients. Martinello Decl., ¶ 9. At times, a patient's clinical condition may require their immediate transfer to another healthcare facility, such as a hospital, where the appropriate access to diagnostic tests, clinical monitoring, and/or treatment can be provided. *Id.* Likewise, if a facility is unable to sufficiently protect a resident from a communicable, potentially deadly infectious diseases, it is a duty for the facility to transfer the patient to another facility which can provide the proper level of safety and care for the patient/resident. *Id.*

56.     It is imperative to implement and enforce these and other effective guidelines to control and prevent the spread of COVID-19 among residents of long-term care facilities. Protecting those with the greatest vulnerability to COVID-19 also allows for greater risk mitigation for all people working in the facilities and living in the surrounding community.

*57.*     Conversely, disregarding these guidelines poses a grave, imminent, and irreparable risk to the health and well-being of vulnerable and dependent population of residents within long-term care facilities. Martinello Decl., ¶¶ 12-14. To prevent undue risk of infection and mortality in congregate settings, it is essential to implement an effective Infection Prevention program that

is led by an identifiable individual who has the needed expertise (often recognized by certification in infection control), is provided with authority by facility leadership, is held accountable by facility leadership, and is adequately resourced to manage the facility's infection prevention needs. *Id.*, ¶¶ 10-11.

### III.    QACC's Failure to Implement Proper Disease Prevention or Control Measures, Placing its Disabled Residents at a Serious, Imminent, and Irreparable Risk of Harm in Violation of the ADA and the RA

58.    Unfortunately, Defendants have demonstrated an ongoing pattern of failing to comply with COVID-19 control and prevention guidelines since the CDC and CMS first issued guidelines to facilities like QACC back on March 13, 2020. As a result, COVID-19 is rampant in the facility among residents and staff alike.

59.    Upon information and belief, QACC is one of the largest adult homes in New York State, known to provide assisted living services to individuals with physical disabilities as well as individuals with mental illnesses. About 200 out of a total of 352 available beds at QACC are specifically designated as assisted living program beds. In addition, QACC is registered with CMS and the New York Department of Health as an Assisted Living Facility.[14]

60.    Assisted Living Facility is required to provide a level of care appropriate for those who are unable to live by themselves and require assistance and/or monitoring to assure their safety and well-being, but who do not have medical conditions requiring more extensive nursing care. McCallion Decl., ¶ 11.

61.    Defendants have marketed QACC as not merely an adult home but an assisted living facility with skilled nursing services available on site. On their website, Defendants state that QACC provides Assisted Living Program ("ALP") which is explained to serve "as an

---

[14] https://npidb.org/organizations/nursing_and_custodial_care/assisted-living-facility_310400000x/1669885174.aspx

alternative to nursing home that enables nursing home eligible residents to receive home health care services in the facility," with "Skilled Nursing Services Provided by On-Site Home Care Agency to those resident [sic] who require skilled care."[15] Defendants also state in their online marketing brochure that QACC:

> Offer[s] just the right amount of assistance tailored to each resident's individual needs, enabling each person to live in the most independent and least restrictive environment. [QACC] offers a wide spectrum of services including case management, to recreational activities, to assistance with self-administration of medications and meal preparation.

62.     QACC has been accepting and retaining residents with conditions and care needs that were once handled almost exclusively in skilled nursing facilities. This has allowed it to increase the potential resident pool by promising to provide skilled health care services.

63.     As a long-term care facility that provides nursing services, QACC is also subject to federal regulations for states and long-term care facilities including 42 C.F.R. § 483. In order to participate in Medicare and Medicaid, which upon information and belief QACC does, a facility must establish and maintain a working system for preventing, identifying, reporting, investigating, and controlling communicable diseases for all residents, staff, volunteers, and visitors. In addition, the facility must designate an infection preventionist who appropriate specialty to oversee infection prevention and control. In violation of this regulation as well as instructive guidelines from the CDC and CMS, QACC has failed to establish standards and transmission-based precautions to be followed to prevent spread of COVID-19 and to take corrective actions.

64.     Defendants have failed to take necessary and appropriate measures to control and prevent the spread of COVID-19 among QACC's residents who, individually and as a population, are highly vulnerable to contracting and suffering dire consequences from COVID-19 due to their disabilities. Failure to establish policies, practices, and procedures to safeguard the disabled

---

[15] https://gefenseniorcare.com/assisted-living-services/

residents' right to access and enjoy QACC's facilities and services constitutes a violation of Title III of the ADA and § 504 of the RA.

65.     Upon information and belief, an overwhelming majority of QACC's residents suffer from a disability, whether it be age-related or psychiatric, that put them at an increased risk of severe illness and death upon contraction of COVID-19. *See* Ex. B, Declaration of Natasha Roland, daughter and appointed healthcare proxy of Plaintiff Willie Roland, dated May 3, 2020 ("Roland Decl."), ¶ 5. Furthermore, upon information and belief, mentally ill residents who suffer from various psychiatric and mental disorders comprise approximately two-thirds of QACC's resident population. Simpson Decl., ¶ 2.

66.     The conditions at QACC pose a grave health risk for the spread of COVID-19 to this already-vulnerable population. Residents live, eat, and socialize in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Simpson Decl., ¶¶ 4-5. Residents typically share a small room with one (1) other resident with their beds placed only a few feet apart from each other, and two (2) rooms with four (4) residents typically share one bathroom. *See* Ex. C, Declaration of Bruce Schoengood, identical twin brother and appointed healthcare proxy of Plaintiff Bryan Schoengood, dated May 3, 2020 ("Schoengood Decl."), ¶ 5.

67.     Due to these constraints, QACC's residents are often unable to maintain the recommended distance of six (6) feet from others, and may share or touch objects used by others. Toilets, sinks, and showers are shared, often without disinfection between each use. Many daily activities such as meal and recreation are communal with little opportunity for surface disinfection. Hundreds of residents share access to popular common areas and hallways. Residents with

disabilities are further limited in their ability to distance themselves from others, and in the case of those with mental illness, even in their ability to understand the need to do so.

68.     With an increasing number of residents testing positive for the coronavirus or dying from it, QACC has begun to implement some rudimentary instructions to its residents for hygiene, safety isolation, or separation. However, these instructions have been framed as voluntary requests that are often ignored. Simpson Decl., ¶¶ 6-7. Residents with disabilities, due to their physical or cognitive limitations, are especially unlikely to heed to these voluntary requests.

69.     Upon information and belief, QACC does not have a protocol in place for comprehensive testing or screening of residents or staff for cough, fever, and respiratory symptoms. Simpson Decl., ¶ 9. QACC has failed to screen all staff at the beginning of their shift for fever and respiratory symptoms by actively taking their temperature and documenting absence of shortness of breath, new or change in cough, and sore throat. In addition, despite requests of family members of residents, QACC's residents are not being screened or tested, even those who have had direct and close contact with other residents diagnosed with COVID-19. Schoengood Decl., ¶ 11; Simpson Decl., ¶ 9.

70.     Upon information and belief, despite requests of family members of residents, Defendants have failed and refused to identify or isolate those residents who are particularly susceptible or vulnerable to COVID-19 because of their disabilities, defined as physical or psychiatric ailments. Schoengood Decl., ¶ 9.

71.     Upon information and belief, the facility continues to accept new residents to fill up beds that become vacant with an increasing number of residents leaving the facility due to hospitalizations or deaths. Schoengood Decl., ¶ 12. Upon information and belief, these new

residents also do not undergo comprehensive screening for COVID-19 symptoms or related history.

72.     Upon information and belief, there is a complete lack of isolation and enforcement of social distancing among its residents, including those residents who are symptomatic or suspected to have COVID-19. Schoengood Decl., ¶ 9; Simpson Decl., ¶¶ 5-7; Roland Decl., ¶ 23. QACC's residents continue to share room with residents who are suspected of having, or already diagnosed with, COVID-19. Schoengood Decl., ¶ 9; Simpson Decl., ¶ 8. Plaintiff Bryan Schoengood, for example, remained in the same room as his former roommate who succumbed to COVID-19, sleeping just a few feet away from his bed. Schoengood Decl., ¶ 9.

73.     Upon information and belief, residents are permitted to congregate in large groups and at close distances, including eating together and smoking in the hallways, watching TV in the TV room, and socializing in large groups, often without the proper use facemasks and without enforcement of social distancing. Simpson Decl., ¶¶ 5-6. For example, even though Plaintiff Bryan Schoengood was never tested for coronavirus despite his roommate's death from COVID-19, he continues to have essentially unrestricted movement throughout the facility, including its hallways, common areas, and outdoor grounds without undergoing COVID-19 screening or testing. Schoengood Decl., ¶ 12. While residents are provided an option to eat in their rooms, many still choose to eat in the common areas of the facility with other residents, and the facility permits this to occur. Schoengood Decl., ¶ 13. Plaintiff Annetta King Simpson observes approximately 20 residents continuing to congregate every night outside her room. Simpson Decl., ¶ 6.

74.     Upon information and belief, QACC does not provide, or enforce the usage of, appropriate protective clothing, gears, or supplies such as masks. Schoengood Decl., ¶ 14; Simpson Decl., ¶ 5. This lack of enforcement is particularly troubling to residents with disabilities, including

mental illness, who may not be able to comprehend the gravity of the safety concerns of COVID-19 and the need for usage of protective devices. Disabled residents are also more likely to misuse the masks or fail to utilize them properly to cover their noses and mouths. Schoengood Decl., ¶ 14.

75.    Upon information and belief, QACC does not have a comprehensive protocol in place to isolate residents who are suspected to have the coronavirus or who test positive for the coronavirus. Simpson Decl., ¶ 8. Residents who are symptomatic and suspected to suffer from COVID-19 remain in their usual rooms often with other residents, and not separated in any fashion from other residents. Simpson Decl., ¶ 8. There is no isolation or quarantine area set up in the facility which consists of three floors and three units per floor. Schoengood Decl., ¶ 10; Simpson Decl., ¶¶ 7-8. Subsequent to the death of his roommate, Plaintiff Bryan Schoengood was not tested for COVID-19 and was not put in quarantine or isolation. Schoengood Decl., ¶ 15. This is particularly disturbing given Mr. Schoengood's apparent lack of comprehension and self-awareness regarding the risk of COVID-19 infection and its consequences. *Id.*

76.    Moreover, to the extent that their physical conditions allow, QACC's residents are allowed to roam the streets of the neighboring community with little supervision or control, and with no COVID-19 screening. Schoengood Decl., ¶¶ 12, 15; Simpson Decl., ¶ 9. QACC's policy and practice of not isolating its sick residents puts residents with disabilities including mental illnesses at a particularly heightened risk because of their inability to comprehend the grave and urgent need for self-quarantine. Schoengood Decl., ¶ 15.

77.    Upon information and belief, QACC lacks adequate medical infrastructure to address the spread of infectious disease and treat the people most vulnerable to COVID-19. Staff members are not trained to recognize and address disabilities and other comorbidities that indicate

25

increased vulnerability or risk of respiratory disease for residents. Simpson Decl., ¶ 11. Even when a QACC resident becomes visibly and severely symptomatic, there is no plan in place for their referral and transfer to a hospital for appropriate intensive care. Simpson Decl., ¶¶ 10-12. Instead, staff members often leave visibly sick disabled residents to languish in their rooms as the staff are unable or unwilling to provide care and treatment to these people. *Id.* In one instance, a resident had died in his bed and his body was left there for almost a day with his roommate remaining in the room. Simpson Decl., ¶ 18.

78.     Given these dire circumstances, family members and other residents of QACC complain of having to take matters into their own hands by rendering care and assistance to sick residents who are suspected to have the coronavirus or who test positive for the coronavirus, putting themselves at a direct risk for contracting and further spreading the virus. Simpson Decl., ¶¶ 10-12. For example, QACC's staff members refused to provide care to Plaintiff Willie Roland when he fell visibly ill from coronavirus and almost died, losing a significant amount of weight. *Id.* Staff left Mr. Roland's food at his door, refused to come into his room to assist him with eating, his medications, provide him with any care, test him (or send him for testing) for COVID-19, or even take his temperature. Simpson Decl., ¶ 11; Roland Decl., ¶ 10. Nor would they provide his family with updates concerning his condition. *Id.* As a result, Plaintiff Annette King Simpson had to provide care to Mr. Roland, eventually contracting and failing ill to the coronavirus as well. Simpson Decl., ¶¶ 12-15.

79.     The absence of protocol for prompt transfer to a hospital is particularly troubling because people who contract COVID-19 can deteriorate rapidly, even before a test result can be received. These patients need constant and intensive monitoring. Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases,

extracorporeal mechanical oxygenation. Such care requires specialized equipment in limited supply as well as an entire team of specialized care providers. QACC does not have that specialized equipment or specialized providers. In fact, QACC seems to be failing in the most basic duties of screening or testing residents for COVID-19 or assisting sick residents with meals or medications. Simpson Decl., ¶¶ 12-15.

80.     Defendants have deliberately refused to make public or inform the family members of QACC's residents regarding the QACC's polices, practices, and procedures for preventing COVID-19 outbreak and responding to the residents who contract coronavirus. Simpson Decl., ¶ 16. QACC's management has refused to provide vital information to the residents' family members, including those who are the appointed healthcare proxy of the residents, concerning the conditions within the facility, and in particular, the effects of COVID-19 on its resident population and the specific residents and what actions the facility is taking to protect its residents and mitigate the COVID-19 risk. Simpson Decl., ¶ 16; Roland Decl., ¶ 6; Schoengood Decl., ¶ 17.

81.     Defendants have also refused to share, or conveyed misleading or false information, to residents and family members regarding the number of residents within QACC who have fallen ill, who have contracted the virus, or who have died from the virus. Simpson Decl., ¶ 18; Roland Decl., ¶ 6. Family members describe having inquiring QACC's administrator regarding the risks posed by the coronavirus to QACC's residents and consistently being told that the facility is "safe" for the residents. Roland Decl., ¶¶ 7-9. Family members are being told that there are no or very few cases of COVID-19 infection in the facility, when this is in fact far from the truth. Roland Decl., ¶¶ 9-14. This lack of transparency further jeopardizes the disabled residents within QACC who are not able to advocate for their needs or gather information as their non-disabled peers may.

82.     Although QACC and its staff have not disclosed the true calamity of what is going on inside the facility, residents report that at least 14 residents of QACC have died so far from COVID-19, and many more have and continue to suffer from COVID-19 with little to no assistance from the facility or its staff.  Simpson Decl., ¶ 18; Roland Decl., ¶ 22; Schoengood Decl., ¶ 10.

83.     Defendants have violated the ADA and the RA by failing to make their assisted living facility readily accessible to and usable by persons with disabilities, even though these laws impose affirmative duties upon Defendants to make their assisted living facilities accessible. Defendants' response to COVID-19 crisis within QACC does not meet the needs of persons with disabilities, whether it be persistent mental illness or chronic medical conditions.

84.     Defendants have also violated the ADA and the RA by failing to make reasonable modifications to their policies, practices, and procedures that are necessary for persons with disabilities to have full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages and accommodations provided by QACC. For instance, staff were overly focused upon resident choice, did not understand the risk that COVID-19 represents for this vulnerable population, and did not have the training, tools, or instructions to successfully manage risk and response to COVID-19, thereby failing to provide protections, care, and services to the residents with disabilities that were required to be provided under the ADA and § 504 of the RA. *See* McCallion Decl., ¶ 16.

## IV.     QACC's Reckless Disregard of the Health and Safety of Its Residents

85.     Upon information and belief, QACC's leadership and staff have demonstrated a pattern of reckless disregard for the well-being of its residents and the applicable guidelines in place to prevent and control the spread of COVID-19 among its residents. This puts residents with

disabilities who are unable to obtain information, advocate for themselves, or protect and isolate themselves from human contact at an unequal and heightened risk of serious illness or death.

86.     Upon information and belief, Defendants have been aware of the substandard conditions of QACC and of its failure to accommodate its disabled residents in the context of COVID-19 pandemic. Yet, Defendants have failed and refused to implement proper protocols for disease control and prevention, recklessly and knowingly causing residents to be exposed to a substantial risk of serious illness and death from contracting COVID-19.

87.     Upon information and belief, by March 22, 2020 at the latest, Defendants were clearly aware that the deadly coronavirus had made its way into QACC as the first known instance of resident's death due to COVID-19 occurred at that time.[16]

88.     Nevertheless, Defendants have failed to implement or enforce testing, screening, isolation, or treatment measures in place for those residents suspected to be infected or who have had direct contact with residents diagnosed with COVID-19. Residents are allowed to freely enter and leave the facility from the surrounding Elmhurst area and to congregate in groups without screening or protective equipment, all in violation of CDC, CMS, 42 C.F.R. § 483, and New York Public Health rules and guidelines.

89.     Tragically, upon information and belief, at least 15 of the facility's residents have already died, and many more have been confirmed for illness and complications from COVID-19 including Plaintiffs Annetta King Simpson and Willie Roland. Simpson Decl., ¶¶ 4, 18; Roland Decl., ¶ 22; Schoengood Decl., ¶ 10.

---

[16] Joaquin Sapien, *Now That Coronavirus Is Inside This Adult Home for the Elderly or Mentally Ill, It May Be Impossible to Stop*, ProPublica (Apr. 2, 2020), https://www.propublica.org/article/now-that-coronavirus-is-inside-this-adult-home-for-the-elderly-or-mentally-ill-it-may-be-impossible-to-stop

90.     There continues to be a concerted effort by the Defendants to hide from residents and their families what is going on within the facility, including the number of COVID-related deaths and the number of residents suspected of having the virus. Simpson Decl., ¶¶ 16-18; Roland Decl., ¶¶ 6-14; Schoengood Decl., ¶ 17.

91.     At the same time, family members are limited in the amount of information they can comfortably request or demand from the Defendants. Some family members fear that if they were to be seen as raising a complaint regarding QACC's policies, the resident may be asked or ordered to leave the facility.

92.     Defendants continue to refuse to inform QACC's residents or their family members regarding the prevalence of COVID-19 within QACC and regarding concrete measures in place to prevent the spread of the infection, except for general exhortations (delivered in groups) to wash their hands and practice social distancing. Upon information and belief, QACC is deliberately obfuscating facts regarding the conditions and medical catastrophe that is unfolding inside the facility on a day-to-day basis. Simpson Decl., ¶¶ 16-18; Roland Decl., ¶¶ 6-14; Schoengood Decl., ¶¶ 16-17. When pressed by family members for suggestions, the staff members indicate that it is evitable that the residents will be infected with the coronavirus and that the residents should do bare minimum such as eating all three (3) meals to keep up their strength once they become infected with the virus. Schoengood Decl., ¶ 16.

93.     Defendants have not informed the residents or their family members of what the protocol will be for monitoring and quarantining exposed or symptomatic patients; for testing, caring for, and treating patients sick with the virus; for timely transferring sick patients out of the facility to a hospital with intensive care capacity. Absent a transparent protocol shared with

residents as well as their families or healthcare proxies, residents with disabilities cannot make educated or autonomous decisions regarding their health and are left at Defendants' mercy.

94.     Despite requests and inquiries from family members, Defendants have refused to implement a disciplined structure to institute social distancing and protective equipment requirements and further, prevent patients from congregating in community rooms and hallways, or facility perimeters without necessary precautions. Defendants have also failed to hire or train a capable team of staff or leadership to follow and implement the applicable rules and guidelines for infectious disease prevention and control including those from CDC, CMS, 42 C.F.R. § 483, and the New York Department of Health.

95.     The requirements that Assisted Living Programs provide medical supplies and equipment, adult day health care, home health services, and case management services of a registered professional nurse show that there was a failure to provide supports that would be expected and should be possible, given these requirements. McCallion Decl., ¶ 18.

96.     Despite taking on the responsibility to take care of the residents' health and safety by admitting them, Defendants have disregarded the clear need to ensure the safety of QACC's residents and staff despite their awareness of a risk in having a communicable disease spread through the facility. Martinello Decl., ¶¶ 6, 8.  Upon information and belief, Defendants have failed to take steps to implement an effective infection disease program, including policies and practices set in place to minimize the communicability of coronavirus and to minimize the risk of residents or staff acquiring illness. *Id.*, ¶¶ 11-13.

97.     Defendants have disregarded the need to transfer QACC's residents who have fallen ill to COVID-19 or who are suspected to have fallen ill to another facility even though they

are aware that their illness outstrips QACC's limited capabilities to care for its residents. Martinello Decl., ¶ 9.

98.     An infectious disease specialist and an epidemiologist Richard Martinello, M.D. has opined that the above-outlined facts are concerning as they reflect the absence of an effective infection prevention program at QACC. Martinello Decl., ¶¶ 12-14. Similarly, an expert with specialty in assisted living and nursing facility administration Philip McCallion, PhD, ACSW., also opined that there were no protocols in place to address the infection, or if there were protocols, they were not consistently followed as they should have been. McCallion Decl., ¶ 16. There was a plain failure to provide supports that would be expected and should be possible, given these requirements. *Id.*

99.     These gross and reckless deficiencies have placed QACC's residents at a heightened, unnecessary, and unreasonable risk for their health and safety, and will continue to do so absent immediate and appropriate countermeasures ordered by the Court and overseen by an expert Special Master. Martinello Decl., ¶¶ 11-15; McCallion Decl., ¶¶ 19-21.

100.    Therefore, immediate judicial relief is necessary to prevent an imminent and serious risk of irreparable harm to Plaintiffs and the class they seek to represent.

**V.     Particular Vulnerability of the Plaintiffs**

101.    Plaintiffs in this case are examples of QACC's residents who are particularly vulnerable to contracting COVID-19 and to serious illness or death if infected by COVID-19.

102.    Vast majority of patients in an assisted living or nursing facility have chronic health, mental health, and/or physical disabilities. Martinello Decl., ¶ 13. They reside in such a facility because of their dependence on healthcare professionals to ensure their safety and ability to manage their activities of daily living. Chronic conditions such as those often found among

residents of these facilities place them at greater risk for serious illness or death if infected by COVID-19, and also likely limit their ability to protect themselves effectively against the risk for exposure to COVID-19 or to leave the facility by their free will. Martinello Decl., ¶ 13; McCallion Decl., ¶ 12. This is the case for all three Plaintiffs herein.

103.    Bryan Schoengood. Mr. Schoengood is 61 years old. He has been diagnosed with paranoid schizophrenia, and has been a resident of QACC for approximately 31 years because of this condition. Mr. Schoengood's former roommate was diagnosed with COVID-19, and upon information and belief was one of the first QACC residents to have died from the disease. Due to his significant mental illness, Mr. Schoengood is unable to understand the risk of COVID-19 and the necessary precautions to prevent the disease. Mr. Scheongood's daily routine continues to involve congregating with other residents to watch TV and eat meals in the common area. To date, he has never been tested for COVID-19 despite his close proximity to his roommate who recently died from it. Notwithstanding his twin brother Bruce Schoengood being his appointed healthcare proxy, facility staff have failed to advise him regarding the death of Mr. Schoengood's roommate from COVID-19, and the measures taken to protect Mr. Schoengood from infection. Mr. Schoengood is critically vulnerable to COVID-19 because of his disability. *See* Ex. C, Schoengood Decl.

104.    Annetta King Simpson. Ms. Simpson is 64 years old and is a retired teacher. She suffers from chronic and severe cardiovascular disease, with a history of prior myocardial infarction, six (6) stents of major cardiac vessels, as well as diabetes and hypertension. Ms. Simpson assisted and personally cared for several residents, including co-Plaintiff Willie Roland, who were ill and were suspected as having COVID-19 because QACC providers and staff would not assist or even enter the rooms of those residents who were suspected as having COVID-19.

Shortly after caring for Mr. Roland, Ms. Simpson became seriously ill and was transferred to Long Island Jewish Medical Center where she was tested positive for COVID-19. She was subsequently transferred to the Jacob Javits Center where she received intensive treatment for COVID-19. She recently returned to QACC after discharge from the Jacob Javits Center. Upon return to QACC, Ms. Simpson has observed continued failure of the facility to implement proper measures for infectious disease prevention and control. She observes residents routinely congregating in large groups and in close proximity in common areas, hallways, and recreation rooms. She observes a continued lack of screening for fevers or other symptoms that may be consistent with the disease, and lack of isolation measures in place to isolate those residents suspected as having COVID-19 from the rest of the resident population at QACC. Ms. Simpson was and is critically vulnerable to COVID-19 because of her disability. *See* Ex. A, Simpson Decl.

105.   <u>Willie Roland</u>. Mr. Roland is 82 years old. He suffers from chronic obstructive pulmonary disease and diabetes, has a cardiac valve pump, and is legally blind. In late March or early April 2020, Mr. Roland became severely ill with what was suspected to be COVID-19. After he became sick, providers and staff at the facility refused to care for him or even provide him with his daily diabetes regimen. Instead, he relied on the good will of other residents in the facility, namely co-Plaintiff Annetta King Simpson to provide him with those medications and to care for him. He was ultimately carried out of QACC by his children and transferred on April 6, 2020 to New York Presbyterian hospital, but not until he lost approximately 35 pounds and was gravely ill from the disease. He is now at a rehabilitation facility where he continues to recover from COVID-19.  As Ms. Simpson did, Mr. Roland intends to return to QACC if the conditions improve. Mr. Roland was and is critically vulnerable to COVID-19 because of his disability. *See* Ex. B, Roland Decl.

## LEGAL ALLEGATIONS

### I.     Defendants' Conduct is in Violation of the ADA and the RA.

106.    Plaintiffs bring this action under Title III of the ADA, 42 U.S.C. §§ 12101 *et seq.*, and under § 504 of the RA, 29 U.S.C. §§ 701 *et seq.*

107.    Defendants are violating Plaintiffs' rights under the ADA and the RA by continuing to subject them to conditions where it is virtually impossible to take steps to prevent transmission of an infectious disease that will prove deadly because of the Plaintiffs' vulnerable conditions.

108.    The RA was enacted before the ADA. Its focus is narrower than that of the ADA. Its provisions apply only to programs that receive federal financial assistance.

109.    Congress enacted the ADA to provide a more comprehensive statutory solution to widespread discrimination against persons with disabilities in all aspects of society. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001). To advance its stated purpose of eliminating and providing remediation for such discrimination, the ADA is to be construed broadly. *See, e.g., Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003).

110.    Nonetheless, both § 504 of the Rehabilitation Act and Title III of the ADA have generally equivalent requirements for claims, such that claims under those statutes are analyzed together. *Dean v. Univ. at Buffalo Sch. of Med. and Biomedical Sciences*, 804 F.3d 178, 187 (2d Cir. 2015) (citing *Harris v. Mills*, 572 F.3d 66, 73–74 (2d Cir. 2009)). As such, to establish a prima facie violation of either statute, a plaintiff must show "(1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability." *Powell v. Nat. Bd. of*

*Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004) (alterations omitted) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

111.    At all times relevant to this action, Plaintiffs and the class they seek to represent were and remain qualified individuals with disabilities.

112.    Title III of the ADA provides in pertinent part: "[N]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or leases to, or operates a place of public accommodation." 42 U.S.C. § 12182.

113.    Under 42 U.S.C. § 12181(7), "[t]he phrase 'public accommodation' is defined in terms of 12 extensive categories, which the legislative history indicates 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled." *PGA Tour*, 532 U.S. 676-77.

114.    QACC is an assisted living facility. Assisted living facilities provide basic and personal care services to their residents, and clearly fall under the enumerated categories of "service establishment," "senior citizen center," and "other social service establishment." 42 U.S.C. § 12181(7)(F) & (K); *see also* 28 C.F.R. § 36.104.

115.    Courts have recognized as "public accommodations" those entities whose services and benefits are provided only to qualified members of the public. *PGA Tour*, 532 U.S. at 677-80 (the fact that plaintiff needed to compete to be eligible for defendant's services and benefits did not exclude him or the PGA Tour from ADA coverage).

116.    As a place of public accommodation, QACC has violated Title III of the ADA in various ways. It is well established that even facially neutral policies may violate the ADA when

such policies unduly burden disabled persons. *See*, *e.g.*, *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565 (2d Cir. 2003).

117.    Section 504 of the RA states that "[n]o otherwise qualified individual with a disability in the United States […] shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

118.    Upon information and belief, Defendants receive federal financial assistance in owning, managing, and operating QACC.

119.    Defendants are charged with ensuring that QACC's services and programs are conducted in conformity with § 504 of the Rehabilitation Act and Title III of the ADA. By failing to comply with regulations and guidelines with respect to control and prevention of COVID-19, Defendants have discriminated against or denied the opportunity for QACC's residents with disabilities to benefit from services, programs, or activities for which the Defendants had responsibility.

120.    Plaintiffs and other disabled residents of QACC are placed at a high risk of serious COVID-19 illness or death because of their disabilities, whether physical or mental.

121.    Upon information and belief, more than half of QACC's residents suffer from various psychiatric and mental disorders comprise more than 50% of QACC's resident population. Simpson Decl., ¶ 2. As a result of this disability, these residents have severely limited capability to isolate themselves from communing with others who may have contracted COVID-19 or come into contact with those who have.

122.    Because of their physical infirmities and/or psychiatric conditions, residents with disabilities are also not able to request medical attention or transfer to an outside medical facility once they notice the onset of COVID-19 symptoms as their non-disabled peers may.

123.    Residents with disabilities are also more likely to be at a heightened risk of serious illness or death if they were to contract the coronavirus.

124.    Defendants have violated Title III of the ADA and § 504 of the RA by maintaining a policy and practice of staffing their facility without regard for residents' needs, making it impossible for residents with disabilities to access the services, goods, facilities, privileges, advantages or accommodations for which they have paid without a fear of contracting COVID-19.

125.    QACC's failure to protect its disabled residents from harm poses a heightened risk to their health and safety because of their disability. The facility is not equipped to stop the spread of the disease or treat residents who become ill. Plaintiffs and the putative class are at an increased risk of contracting the virus and of suffering serious illness or death upon contraction of the virus because of their underlying medical conditions, whether physical or mental.

126.    In addition, Defendants have violated 42 U.S.C. § 12182(b)(2)(A)(ii) by refusing to make reasonable modifications in policy and practice to provide sufficient staffing so that Plaintiffs may receive full and equal access to and enjoyment of QACC's services. Such reasonable modifications in QACC's policies, practices and procedures are necessary to ensure that Plaintiffs and the members of the putative class receive full and equal access to and enjoyment of QACC's services, including assistance with, inter alia, feeding, bathing, showering, toileting, transferring, taking medications, dressing, dining, and housekeeping.

127.    Unless and until QACC makes reasonable modifications in policies, practices, and procedures as required by Title III of the ADA and § 504 of the RA, Plaintiffs and the members

38

of the putative class will continue to be denied full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages and accommodations that QACC claims to provide to all of its residents.

**II.     Injunctive Relief is an Appropriate Vehicle to Address the Imminent and Serious Risk of Irreparable Harm to the Plaintiffs Caused by Defendants' Violation of the ADA and the RA.**

128.     Judicial intervention through injunctive relief is necessary to ensure that QACC's residents have their disabilities in a manner to reasonably protect their health in accordance with good and accepted practice applicable to this assisted living facility. *See* Martinello Decl., ¶¶ 12-15; McCallion Decl., ¶¶ 19-21.

129.     Court can award injunctive relief under both the ADA and the RA. To support such a claim, Plaintiffs must plead a violation of each statute and that they will suffer real, imminent, and irreparable harm absent a remedy. *Henrietta D.*, 331 F.3d at 290. Claims for injunctive relief do not require a showing of discriminatory animus. *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016).

130.     Left to their own devices, Defendants' violations of the ADA and RA will continue to inflict serious, imminent, and irreparable injury to QACC's vulnerable residents.

131.     External oversight must be provided through an emergency appointment of a Special Master to chair the investigation of QACC's health and safety compliance for mitigation of COVID-19 for its qualified residents with medical conditions and other disabilities entitled to protection under the ADA and RA.

132.     Defendants are unable to self-police and ameliorate their acts to adequately protect their vulnerable residents from COVID-19. With confirmed COVID-19 infections among staff and residents at the facility and the facility's disregard of applicable guidelines to protect its residents

from the disease, internal transmission of the virus to all residents within the facility will be an eventuality without the Court's intervention to compel QACC to follow applicable guidelines.

133.    QACC has a history of inadequate staffing and gross neglect of its disabled residents. For example, upon information and belief, Defendants have been under investigation by the New York State ombudsman's office for their misappropriation of New York State funds under the EQUAL Program. EQUAL funds are provided by the state for the purpose of enhancing both residents' quality of care and life experience in the adult care facility. A condition for participation in the EQUAL program is that the funds "will not be awarded to subsidize daily operational expenses such as staffing or utilities."[17] Nevertheless, upon information and belief, Defendants used the EQUAL funds for their facility's renovation rather than for resident care.

134.    Defendants have a policy and practice of staffing and operating QACC without regard for residents' needs, making it impossible for residents with disabilities to access the services, goods, facilities, privileges, advantages or accommodations for which they have paid, especially in the context of the COVID-19 pandemic.

135.    Defendants' history of gross negligence and recklessness toward resident care highlights the need for injunctive relief including the appointment of a Special Master whose duties would be to provide external oversight of COVID-19 mitigation plans within QACC.

136.    Unfortunately, the COVID-19 pandemic is not expected to resolve in the near future. A team of pandemic experts advised as of April 30, 2020, that the United States must

---

[17] New York State Department of Health Division of Adult Care Facility/Assisted Living Surveillance, *Conditions for Participation in the Enhancing the Quality of Adult Living (EQUAL) Program 2018-2019*, https://www.health.ny.gov/facilities/adult_care/dear_administrator_letters/docs/2018-05-01_dal_18-11_2018-2019_equal_instructions.pdf

prepare for a likelihood that the virus will keep spreading for at least another 18 months to two (2) years.[18]

137.    Therefore, Plaintiffs will continue to face irreparable harm if QACC is not compelled to abide by the applicable guidelines concerning COVID-19 with oversight of a Special Master to advise on the development, implementation and success of policy, procedures, and interventions. These measures are necessary to provide the residents with disabilities full and equal opportunity to access and enjoy QACC's services without undue risk of contracting the virus.

138.    Unless and until Defendants bring their facility into compliance with the requirements of the ADA and the RA and applicable standards, Plaintiffs and the members of the putative class will continue to be denied full access to and enjoyment of QACC's services in violation of the ADA and the RA.

139.    Unless and until Defendants make reasonable modification in QACC's policies, practices, and procedures with respect to the staffing and implementation of properly functioning infectious disease prevention and management protocols, Plaintiffs and the members of the putative class will continue to be denied access to and enjoyment of the services, goods, facilities, privileges, advantages and accommodations purportedly provided to QACC's residents.

140.    The relief sought herein is urgently requested to prevent further and ongoing catastrophe among the approximately 350 residents of QACC who represent some of the most vulnerable individuals to COVID-19, many of whom have disabilities that put them at a grave risk of contracting COVID-19 under the conditions that exist at QACC. Because of their medical conditions and other qualifying disabilities, Plaintiffs are at a substantially increased risk of death or serious illness if infected by COVID-19.

---

[18] Maggie Fox, *Expert report predicts up to two more years of pandemic misery*, CNN (May 1, 2020), https://www.cnn.com/2020/04/30/health/report-covid-two-more-years/index.html

141.    A present and actual controversy exists regarding the respective rights and obligations of Plaintiffs and Defendants. Plaintiffs desire a judicial determination of their rights and Defendants' obligations in a declaration as to whether, and to what extent, the Defendants' conduct violates applicable law.

142.    Such a declaration is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights. Such a declaration is also necessary and appropriate to prevent further harm or infringement of Plaintiffs' rights.

143.    Plaintiffs have no adequate remedy at law for the harm to them arising from the conduct alleged herein. Unless and until Defendants are preliminarily and permanently enjoined from engaging in such conduct, Plaintiffs will continue to suffer irreparable harm as a result of Defendants' violations of the ADA and the RA as alleged herein. Moreover, given the grave risk of harm and/or death facing QACC's residents by Defendants' failure to comply with the applicable disease prevention regulations and protocols, the balance of equities and the public interest clearly favor the Plaintiffs herein.

144.    Plaintiffs are entitled to declaratory and injunctive relief pursuant to the ADA and the RA. Defendants must be immediately enjoined to provide services that comply with applicable regulations and guidelines of the CDC, CMS, 42 C.F.R. § 483, and New York Public Health Law governing nursing homes and assisted living facilities with regard to the control and prevention of COVID-19. To ensure proper compliance with these protocols, Plaintiffs submit that a Special Master must be appointed on an emergency basis to, *inter alia*, ensure a safe, functioning and effective system to prevent and control the spread of COVID-19 within QACC with a sufficient number of adequately trained staff.

145.    Pursuant to the power of this Court under 28 U.S.C. § 2201 to grant declaratory and injunctive relief, Plaintiffs respectfully request the Court to declare QACC's aforementioned acts and omissions as violative of Title III of the ADA and § 504 of the RA, and to compel QACC to immediately follow applicable rules and guidelines including those of the CDC, CMS, 42 C.F.R. § 483, and New York Department of Health. In addition, Plaintiffs respectfully request that the Court appoint an expert Special Master to chair the investigation and oversight of COVID-19 mitigation efforts at QACC, and order the Defendants to pay the costs associated with this appointment. Examples of specific COVID-19 prevention and mitigation strategies appropriate for QACC are outlined in Dr. McCallion's Declaration (Ex. D), ¶¶ 19-21.

## CLASS ACTION ALLEGATIONS

146.    The named Plaintiffs bring this action on behalf of themselves and all persons similarly situated and seek class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3).

147.    Plaintiffs seek to represent a class consisting of all current and future residents of QACC during the course of the COVID-19 pandemic who have disabilities that require assistance with activities of daily living (the "Class").

148.    This action is brought as a class action and may properly be so maintained pursuant to Federal Rule of Civil Procedure 23 and applicable case law.

149.    Members of the proposed Class are identifiable and ascertainable. Upon information and belief, Defendants retain admission contracts, resident service plans, and billing statements for all persons who currently reside or resided at QACC. The medical conditions that qualify the residents to receive QACC's services are the very disabilities requiring assisted living services that define the Class.

150.     The members of the Class are too numerous to be joined in one action, and their joinder is impracticable and the disposition of their claims in a class action is a benefit both to the parties and to this Court. Upon information and belief, the Class exceeds 300 individuals and will continue to increase as QACC admits new residents during the course of COVID-19 pandemic. The number of persons in the Class and their identities may be ascertained from Defendants' records to be produced in discovery.

151.     Common questions of law and fact exist as to all Class members and predominate over questions that affect only the individual members. All members of the Class have been and continue to be denied their civil rights to full and equal access to, and use and enjoyment of, the services and facilities operated by the Defendants because of the violations of ADA and RA alleged herein.

152.     There are numerous questions of law and fact common to the Class, including, but not limited to:

      a.   Whether QACC, an assisted living facility, is a place of public accommodation within the meaning of Title III of the ADA;

      b.   Whether QACC is a program receiving federal financial assistance within the meaning of § 504 of the RA;

      c.   Whether QACC's conditions described in this Complaint amount to violations of the ADA and § 504 of the RA;

      d.   What measures Defendants took in response to the COVID-19 crisis;

      e.   Whether Defendants implemented a structured plan or protocol during the COVID-19 crisis, and if so, what it was;

f.   Whether Defendants' policies, procedures, and practices during the COVID-19 crisis exposed QACC's residents to a substantial risk of serious and undue harm;

g.   Whether Defendants violated and disregarded applicable rules and guidelines from CDC, CMS, 42 C.F.R. § 483, and New York State Department of Health;

h.   Whether QACC has developed, implanted, or enforced measures to isolate, screen, and test those residents who are suspected to be infected or who have had contact with other residents diagnosed with COVID-19;

i.   Whether QACC has developed, implanted, or enforced measures to restrict congregation of residents in communal areas or to ensure the residents' social distancing and proper usage of protective equipment;

j.   Whether QACC has allowed residents, including those who are suspected to be infected or who have had contact with other residents diagnosed with COVID-19 to freely enter and leave the facility from the surrounding Elmhurst area;

k.   Whether the Defendants knew of and disregarded a substantial and heightened risk of serious harm to the safety and health of the Class;

l.   Whether members of the Class are at a particular risk of harm during the COVID-19 crisis because of their disability, and whether Defendants' policies, procedures, and practices addressed such a heightened risk of harm;

m.   Whether members of the Class are being denied full and equal access to and enjoyment of QACC's goods, services, facilities, privileges, advantages or accommodations;

n. What reasonable modifications in policies, practices and/or procedures can be made to ensure that QACC's residents with disabilities receive full and equal access to and enjoyment of the services;

o. Whether reasonable modifications in policies, practices and/or procedures are necessary to ensure that residents with disabilities have full and equal access to and enjoyment of QACC's goods, services, facilities, privileges, advantages and accommodations as required by Title III of the ADA and § 504 of the RA;

p. Whether Defendants, by their actions and omissions alleged herein, have engaged and continue to engage in a pattern and practice of discriminating against Plaintiffs and other residents with disabilities in violation of the ADA and § 504 of the RA;

q. Whether the Plaintiffs and the putative Class members have been injured;

r. Whether the Plaintiffs and the putative Class members are entitled to declaratory and/or injunctive relief;

s. What relief should be awarded to redress the harms threatened to members of the Class as a result of the conditions at QACC.

153. Absent class certification, individuals with disabilities residing in QACC during the COVID-19 pandemic would face a series of barriers in accessing the relief sought. Due to their physical or mental impairments, members of the Class have limited ability to obtain legal representation and pursue litigation.

154. Defendants' practices and the claims alleged in this Complaint are common to all members of the Class.

155.    The claims of the named Plaintiffs are typical of those of the Class. Plaintiffs are themselves members of the proposed Class. Plaintiffs are threatened with imminent perilous conditions of residence at QACC. Plaintiffs' claims arise from the same uniform policies, procedures, practices and course of conduct on the part of Defendants in operating the QACC. Plaintiffs' claims are based on the same or similar legal and remedial theories as those of the proposed Class and involve similar factual circumstances. The injuries and harms suffered by the named Plaintiffs are typical of those suffered by all the other Class members. Finally, the relief sought herein will benefit the named Plaintiffs and all Class members alike.

156.    The named Plaintiffs will fairly and adequately represent and protect the interests of the Class. They have no interests adverse to the interests of other members of the Class and have retained counsel who are competent and experienced in litigating class actions and civil rights litigation. Counsel for Plaintiffs know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

157.    The Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(2). Defendants have acted and refused to act on grounds generally applicable to the Class, making the declaratory and injunctive relief sought on behalf of the Class as a whole appropriate.

158.    Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting individual members of the putative Class.

159.    In addition, a class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*: 1) individual claims by the Class members would be impracticable because the pursuit of such claims will impose undue financial, administrative, and procedural burdens on the parties and on this Court; 2) the concentration of

litigation of these claims in one forum will achieve efficiency and promote judicial economy; 3) joinder of all Class members is impracticable; 4) individual Class members are unlikely to have an interest in separately prosecuting and controlling individual actions, especially given the injunctive and remedial nature of relief sought herein; 5) the proposed Class is manageable, and no extraordinary difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action; 6) the proposed Class members are readily identifiable; and 7) prosecution of separate actions by individual members of the proposed Class would create the risk of inconsistent or varying adjudications with respect to individual members of the proposed Class that would establish incompatible standards of conduct for QACC.

**FIRST CLAIM FOR RELIEF**
(Declaratory and Injunctive Relief for
Violation of Title III of the Americans with Disabilities Act)

160.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though set forth fully herein.

161.    Plaintiffs bring this claim on their own behalf and on behalf of the Class.

162.    As Congress explicitly stated, the ADA was enacted with the purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

163.    Title III of the ADA provides in pertinent part: "[N]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases ( or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

164.    Title III of the ADA also provides that an entity "shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration: [t]hat have the effect of discriminating on the basis of disability." 42 U.S.C. § 12182(b)(1)(D)(i).

165.    42 U.S.C. § 12102 defines the term "disability" within the ADA statutes as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

166.    At all times relevant to this action, Plaintiffs Bryan Schoengood, Annetta King Simpson, and Willie Roland were and remain to be qualified individuals with disabilities within the meaning of the ADA. They have physical or mental impairments that substantially limit one or more major life activities, have a record of such impairments that qualified them to receive Defendants' services at QACC, and are regarded as having such impairments.

167.    Defendants are each a "private entity," as defined under 42 U.S.C. § 12181(6). They own, operate, and/or manage QACC, a large assisted living facility in Elmhurst, New York. QACC provides and purports to provide assisted living services to its residents, including but not limited to, assistance with managing and taking medication, housekeeping, laundry, dressing, bathing, toileting, hygiene, food preparation, and transportation. Therefore, QACC is considered a "public accommodation" within the meaning of Title III of the ADA, because it should be considered a "senior citizen center […] or other social service center establishment." 42 U.S.C. § 12181(7)(K).

168.    QACC is subject to Title III of the ADA and its corresponding regulations in providing services and benefits to Plaintiffs and the members of the proposed class.

169.    Defendants were obligated under Title III of the ADA to administer polices, practices, and procedures at QACC in a manner that supports and accommodates the needs of its

disabled residents. Plaintiffs and the members of the putative Class are not able to take steps to protect themselves, and their ability to do so is compromised by their disabilities. In addition, they are medically vulnerable and therefore are at a higher risk of developing serious COVID-19 illness.

170.    Given the particular vulnerabilities of disabled residents to COVID-19 and the risk of serious illness or death upon contracting the coronavirus, ADA imposes affirmative obligations on the Defendants to develop and enforce effective polices, practices, and procedures to prevent or mitigate the spread of coronavirus within QACC.

171.    Defendants have violated the ADA by, *inter alia*:

    a.  Failing to take steps to screen or test residents for COVID-19;

    b.  Failing to comply with the applicable disease prevention regulations and protocols;

    c.  Failing to isolate those residents who are suspected to have contracted COVID-19 or have come into contact with someone who did;

    d.  Failing to enforce necessary prevention measures such as social distancing; and

    e.  Failing to provide medical care for visibly ill residents, with staff members not trained or equipped to provide the services, goods, facilities, privileges, advantages or accommodations that those residents require, such as immediate transfer to hospital for intensive care.

172.    Defendants have harmed and will continue to harm QACC's disabled residents in violation of the ADA by failing to take reasonable and adequate measures to redress continued poor conditions and increasing infection in QACC. Defendants have continued to act in this manner, knowing that an increasing number of staff and residents are contracting the coronavirus,

and that residents with disabilities are at a particular risk of contracting COVID-19 and of suffering serious illness or death once infected with coronavirus.

173.    Defendants utilize standards or criteria or methods of administration that have the effect of subjecting individuals with disabilities to increased, imminent, and irreparable harm. Defendants have failed to facilitate the receipt of QACC's services in a setting appropriate to the needs of residents with disabilities.

174.    Defendants have failed and refused to make reasonable modifications in policies, practices, or procedures as required by Title III of the ADA. Those modifications would include immediate and strict compliance with applicable regulations and guidelines from CDC, CMS, 42 C.F.R. § 483, and New York Department of Health governing nursing homes and assisted living facilities with regard to the control and prevention of COVID-19.

175.    These modifications will not make a fundamental alteration in the nature of QACC's services. Rather, Plaintiffs merely seek to ensure that QACC provides its residents with disabilities full and equal access to and enjoyment of the types of services that QACC already promises to provide to its residents. Thus, the requested reasonable modification in policy, practice or procedure would not change the nature or type of services that Defendants sell to the public.

176.    Unless and until QACC makes reasonable modifications in policies, practices, and procedures and implements same to protect its residents from COVID-19, Plaintiffs and the members of the putative Class will continue to be denied full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages, and accommodations that QACC claims to provide to all residents. As COVID-19 rapidly spreads, the already deplorable conditions at QACC will only be exacerbated, and the ability to protect oneself will become even more impossible.

177.     Defendants' failure to adequately protect Plaintiffs from these conditions, or to follow the applicable regulations and guidelines on the control and prevention of COVID-19, constitutes an egregious violation of Title III of the ADA, 42 U.S.C. §§ 12101 *et seq.*, and the regulations promulgated thereunder. The violations include, *inter alia*:

  a.  Failing to provide residents with disabilities the opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, and/or accommodations at QACC as an assisted living facility, in violation of 42 U.S.C. § 12182(b)(1)(A)(i);

  b.  Failing to provide residents with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages and/or accommodations that are equal to that afforded to individuals without disabilities, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii);

  c.  Utilizing standards, criteria and methods of administration that have the effect of discriminating against residents on the basis of their disabilities, in violation of 42 U.S.C. § 12182(b)(1)(D); and

  d.  Failing to make reasonable modifications in its policies, practices, and procedures which are necessary for its residents with disabilities to enjoy and access QACC's goods, services, facilities, privileges, advantages and/or accommodations, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii).

178.     As a direct and proximate result of the aforementioned unlawful conduct of the Defendants, Plaintiffs and the Class have suffered, and continue to suffer irreparable harm including threat of imminent physical injury, pain and suffering, emotional distress, humiliation, hardship and anxiety, serious illness, and death.

## SECOND CLAIM FOR RELIEF
(Declaratory and Injunctive Relief for
Violation of Section 504 of the Rehabilitation Act)

179.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though set forth fully herein.

180.    Plaintiffs bring this claim on their own behalf and on behalf of the Class.

181.    Section 504 of the RA, 29 U.S.C. § 794, provides that no person with a disability shall: "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

182.    Under information and belief, Defendants are recipients of Federal financial assistance.

183.    QACC's programs and activities are financed by Medicare and Medicaid among other federal funding programs.

184.    Regulations implementing § 504 of the RA provide that a "recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap; [or] (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 45 C.F.R. § 84.4(b)(4).

185.    29 U.S.C. 705(20) defines the term "individual with a disability" within the RA statutes as any individual who "has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment." 29 U.S.C. 705(20)(A)(i). In the

alternative, the relevant subchapters of the RA incorporate by reference the definitions of "disability" under ADA, in particular 42 U.S.C. § 12102.

186.   42 U.S.C. § 12102 defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

187.   At all times relevant to this action, Plaintiffs Bryan Schoengood, Annetta King Simpson, and Willie Roland were and remain to be qualified individuals with disabilities within the meaning of the ADA and the RA. They have physical or mental impairments that substantially limit one or more major life activities, have a record of such impairments that qualified them to receive Defendants' services at QACC, and are regarded as having such impairments. Moreover, their physical or mental impairments result in a substantial and permanent impediment to employment.

188.   QACC is subject to § 504 of the RA and its corresponding regulations in providing services and benefits to Plaintiffs and the members of the proposed class.

189.   Defendants were obligated under § 504 of the RA to administer polces, practices, and procedures at QACC in a manner that supports and accommodates the needs of its disabled residents. Plaintiffs and the members of the putative Class are not able to take steps to protect themselves, and their ability to do so is compromised by their disabilities. In addition, they are medically vulnerable and therefore are at a higher risk of developing serious COVID-19 illness.

190.   Given the particular vulnerabilities of disabled residents to COVID-19 and the risk of serious illness or death upon contracting the coronavirus, RA imposes affirmative obligations

on the Defendants to develop and enforce effective polices, practices, and procedures to prevent or mitigate the spread of coronavirus within QACC.

191.   Defendants have violated the RA by, *inter alia*:

a.   Failing to take steps to screen or test residents for COVID-19;

b.   Failing to comply with the applicable disease prevention regulations and protocols;

c.   Failing to isolate those residents who are suspected to have contracted COVID-19 or have come into contact with someone who did;

d.   Failing to enforce necessary prevention measures such as social distancing; and

e.   Failing to provide medical care for visibly ill residents, with staff members not trained or equipped to provide the services, goods, facilities, privileges, advantages or accommodations that those residents require, such as immediate transfer to hospital for intensive care.

192.   Defendants have harmed and will continue to harm QACC's disabled residents in violation of the RA by failing to take reasonable and adequate measures to redress continued poor conditions and increasing infection in QACC. Defendants have continued to act in this manner, knowing that an increasing number of staff and residents are contracting the coronavirus, and that residents with disabilities are at a particular risk of contracting COVID-19 and of suffering serious illness or death once infected with coronavirus.

193.   Defendants utilize methods of administration that have the effect of subjecting individuals with disabilities to increased, imminent, and irreparable harm. Defendants have failed to facilitate the receipt of QACC's services in a setting appropriate to the needs of residents with disabilities.

194.    Defendants have failed and refused to make reasonable modifications in policies, practices, or procedures as required by § 504 of the RA. Those modifications would include immediate and strict compliance with applicable regulations and guidelines from CDC, CMS, 42 C.F.R. § 483, and New York Department of Health governing nursing homes and assisted living facilities with regard to the control and prevention of COVID-19.

195.    These modifications will not make a fundamental alteration in the nature of QACC's services. Rather, Plaintiffs merely seek to ensure that QACC provides its residents with disabilities full and equal access to and enjoyment of the types of services that QACC already promises to provide to its residents. Thus, the requested reasonable modification in policy, practice or procedure would not change the nature or type of services that Defendants sell to the public.

196.    Unless and until QACC makes reasonable modifications in policies, practices, and procedures and implements same to protect its residents from COVID-19, Plaintiffs and the members of the putative Class will continue to be denied full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages, and accommodations that QACC claims to provide to all residents. As COVID-19 rapidly spreads, the already deplorable conditions at QACC will only be exacerbated, and the ability to protect oneself will become even more impossible.

197.    Defendants' failure to adequately protect Plaintiffs from these conditions, or to follow the applicable regulations and guidelines on the control and prevention of COVID-19, constitutes an egregious violation of § 504 of the RA, 29 U.S.C. §§ 701 *et seq*., and the regulations promulgated thereunder. The violations include, *inter alia*:

> a.   Failing to provide residents with disabilities the opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, and/or

accommodations at QACC as an assisted living facility receiving Federal financial assistance, in violation of 29 U.S.C. § 794;

b.  Failing to provide residents with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages and/or accommodations that are equal to or as effective as that afforded to individuals without disabilities, in violation of 45 C.F.R. § 84.4(b)(1)(i)-(iii) and 45 C.F.R. § 84.52(a);

c.  Utilizing criteria or methods of administration that have the effect of discriminating against residents on the basis of their disabilities, in violation of 45 C.F.R. § 84.4(b)(4)(i);

d.  Utilizing criteria or methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the QACC's program with respect to disabled residents, in violation of 45 C.F.R. § 84.4(b)(4)(ii); and

e.  Failing to make reasonable modifications in its policies, practices, and procedures which are necessary for its residents with disabilities to enjoy and access QACC's goods, services, facilities, privileges, advantages and/or accommodations, in violation of 29 U.S.C. § 794.

198.   As a direct and proximate result of the aforementioned unlawful conduct of the Defendants, Plaintiffs and the Class have suffered, and continue to suffer irreparable harm including threat of imminent physical injury, pain and suffering, emotional distress, humiliation, hardship and anxiety, serious illness, and death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class members respectfully request that the Court enter a class-wide judgment for the following relief:

A.    A declaratory judgment that Defendants have violated the Americans with Disabilities Act and the Rehabilitation Act by failing to administer protocols, practices, and procedures with regard to the control and prevention of COVID-19 that are appropriate to the needs of disabled residents;

B.    Certification of this action as a class action;

C.    Preliminary and permanent injunctions requiring that Defendants promptly take such steps as are necessary to mitigate the serious risk of illness, death, and harm from COVID-19 to those who reside or will reside at QACC during the course of COVID-19 pandemic;

D.    Preliminary and permanent injunctions requiring that Defendants promptly come into full compliance with the requirements of the ADA and its implementing regulations by:

a.   directing that Defendants immediately comply with applicable regulations and guidelines of the Centers for Disease Control and Protection ("CDC"), the Department of Health & Human Services Centers for Medicare & Medicaid Services ("CMS"), 42 C.F.R. § 483, as well as New York Public Health Law governing nursing homes and assisted living facilities with regard to the control and prevention of COVID-19; and

b.   appointing a Special Master at Defendants' cost to chair a QACC COVID-19 Advisory Committee during the course of COVID-19 pandemic to (i) evaluate

and oversee QACC and its staff's treatment and care of residents, and (ii) make recommendations for ameliorative action to minimize the impact of COVID-19.

E.  An award to Plaintiffs of reasonable attorneys' fees, costs, and litigations expenses incurred in bringing this action, as provided by law;

F.  Preliminary and permanent injunctions the Court deems necessary to rectify the acts and omissions alleged herein; and

G.  Such other relief as the Court deems just, proper, and equitable.

Dated: New York, NY
May 4, 2020

THE JACOB D. FUCHSBERG LAW FIRM, LLP
*Attorneys for Plaintiffs and the Proposed Class*

 /s/ Jaehyun Oh
By: Jaehyun Oh, Esq.

 /s/ Aaron S. Halpern
By: Aaron S. Halpern, Esq.

 /s/ Alan L. Fuchsberg
By: Alan L. Fuchsberg, Esq.

3 Park Avenue, 37th Floor
New York, NY 10016
Tel. (212) 869-3500
Fax (212) 398-1532
j.oh@fuchsberg.com
a.halpern@fuchsberg.com
a.fuchsberg@fuchsberg.com