```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
BRYAN SCHOENGOOD, ANNETTA KING
SIMPSON and WILLIE ROLAND,

                        Plaintiffs,
                                            **MEMORANDUM AND ORDER**

         -against-                          20-CV-2022 (KAM)


HOFGUR LLC D/B/A QUEENS ADULT CARE
CENTER, and GEFEN SENIOR CARE GROUP,

                        Defendants.

-------------------------------------X
```

**KIYO A. MATSUMOTO, United States District Judge:**

On May 4, 2020, Plaintiffs Bryan Schoengood, Annetta King Simpson, and Willie Rolland (collectively "plaintiffs"), on behalf of themselves and those similarly situated, commenced this action against Defendants Hofgur, LLC d/b/a Queens Adult Care Center ("QACC") and Gefen Senior Care Group ("Gefen") (collectively "defendants"), seeking declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. §§ 701 *et seq.*  Plaintiffs allege that defendants have permitted "substandard conditions in an assisted living facility that primarily houses disabled individuals with physical or mental impairment[s]" during the COVID-19 pandemic.  (ECF No. 1, Complaint ("Compl.") at ¶ 7.)

Presently before the court are the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") for failure to state a claim, (ECF No. 36, Motion to Dismiss), plaintiffs' memorandum of law in opposition to defendants' motion to dismiss, (ECF No. 37, Memorandum in Opposition ("Pl. Opp.")), and defendants' reply in support of the motion to dismiss. (ECF No. 38, Reply.) Defendants' motion to dismiss is granted as set forth below.

## BACKGROUND

I. **Facts**

In considering the defendants' Rule 12(b)(6) motion, the Court accepts as true the following facts alleged in plaintiff's complaint. (*See generally* Compl.) Defendant Gefen owns Defendant QACC, an assisted living facility in Elmhurst, New York. (Compl. at ¶¶ 33-35.) QACC is marketed as a "home for old, sick, or mentally ill New York residents," and has a 350-bed capacity. (*Id*. ¶ 3.) Of the 350 beds, 200 are reserved for "assisted living program beds." (*Id*.) Plaintiffs qualify as "assisted living" residents because they are disabled, but do not "require nursing home care around the clock." (*Id*. ¶ 5.) Plaintiffs are limited in their abilities, such as, "taking medication, housekeeping, laundry, dressing, bathing, toileting, hygiene, food preparation, and transportation." (*Id*. ¶ 4.) Plaintiffs generally allege that QACC failed to provide "the

2

most basic level of care to safeguard their health and safety in the context of a global health pandemic." (*Id.* ¶ 7.)

Specifically, plaintiffs allege that defendants have violated the ADA and RA by failing to comply with regulations and guidelines provided by the Centers for Disease Control and Prevention ("CDC") and the Department of Health and Human Services Centers for Medicare and Medicaid Services ("CMS"), which has led to a rapid increase in COVID-19 cases at the facility. (*Id.* ¶ 58.) This lack of adherence to the guidelines has posed a "grave health risk" to most of the population at QACC who suffer from an underlying disability. (*Id.* ¶ 65.) The residents are kept in close proximity to one another and cannot "achieve 'social distancing.'" (*Id.* ¶ 66.) Rather than impose strict regulations on the residents, QACC has only provided "instructions framed as voluntary requests that are often ignored," especially by those residents with disabilities. (*Id.* ¶ 68.) Additionally, the facility has not implemented a protocol to test and screen for COVID-19 symptoms, nor has QACC provided or enforced the use masks and other protective gear. (*Id.* ¶¶ 69, 74.) QACC has also failed to transfer residents that have COVID-19 to the hospital or to another facility to prevent transmission. (*Id.* ¶ 97.) As of May 4, 2020, the filing date of the complaint, more than ten residents had died from COVID-19. (*Id.* ¶ 82.)

Plaintiffs contend that QACC has "demonstrated a pattern of reckless disregard for the well-being of its residents and the applicable guidelines in place to prevent and control the spread of COVID-19." (*Id.* ¶ 85.) Specifically, plaintiffs allege that defendants have failed to "accommodate its disabled residents in the context of the COVID-19 pandemic." (*Id.* ¶ 86.) The three named plaintiffs in the complaint all suffer from disabilities, placing them at "greater risk for serious illness or death if infected by COVID-19." (*Id.* ¶ 102.) Mr. Schoengood, a long-term resident, suffers from paranoid schizophrenia, making him "unable to understand the risk of COVID-19 and [adhere to] the necessary precautions to prevent the disease." (*Id.* ¶ 103.) Ms. Simpson and Mr. Roland contracted COVID-19 and allege that they were "critically vulnerable to COVID-19 because of [their] disabilit[ies]." (*Id.* ¶¶ 104-105.) Ms. Simpson suffers from cardiovascular disease, diabetes, and hypertension, (*Id.* ¶ 104), and Mr. Roland suffers from chronic obstructive pulmonary disease and diabetes, has a cardiac valve pump, and is legally blind. (*Id.* ¶ 105.) Ms. Simpson provided care to Mr. Roland during his bout with COVID-19 because "QACC providers and staff would not assist or even enter the rooms of those residents who were suspected as having COVID-19." (*Id.* ¶ 104.)

## II. Procedural History

On May 4, 2020, plaintiffs filed their complaint against the defendants alleging violations of Title III of the ADA and Section 504 of the RA. (ECF No. 1, Compl.) On May 8, 2020, plaintiffs filed a letter requesting a pre-motion conference for leave to file a motion for a preliminary injunction. (ECF No. 7, Letter Motion for Pre-Motion Conference.) This court held a pre-motion conference on May 19, 2020, directing the parties to engage in discovery and perform an investigation as to whether QACC has been complying with COVID-19 safety protocols. (ECF No. 42, Official Transcript of Proceedings held on May 19, 2020.)

On May 29, 2020, the parties filed a joint status report stating that they had "conferred and continue to have ongoing discussions regarding the management, operations, policies, procedures and conditions at Queens Adult Care Center facility." (ECF No. 19, Joint Status Report.) Plaintiffs requested documents from defendants after the pre-motion conference, but there was a dispute between the parties as to whether defendants had complied with these requests. (*Id*.) On June 1, 2020, Magistrate Judge Ramon E. Reyes Jr. issued a protective order, stipulated to and agreed to by the parties, protecting the confidentiality of nonpublic and competitively sensitive information. (ECF No. 19-1, Proposed Confidentiality and Protective Order; Dkt. Order, 6/1/2020.)

On July 15, 2020, this court issued a scheduling order in light of defendants' proposed motion to dismiss. (Scheduling Order, 7/15/2020.) Defendants filed their motion to dismiss on October 14, 2020. (ECF No. 36, Motion to Dismiss.) Plaintiffs' memorandum in opposition and defendants' reply to plaintiffs' memorandum were also filed on October 14, 2020. (ECF Nos. 37 and 38.)

## **LEGAL STANDARD**

When considering a motion to dismiss under Rule 12(b)(6), a district court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted). In considering a 12(b)(6) motion, the court may refer to "documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (internal citations omitted); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 1993) (clarifying that "reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the

6

court's consideration of a document on a dismissal motion; mere notice of possession is not enough.") (emphasis in original).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Id*.

## **DISCUSSION**

### I. Legal Standard under the Americans with Disabilities Act and Rehabilitation Act

Both the ADA and RA "prohibit discrimination against qualified disabled individuals by requiring that they receive reasonable accommodations that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell v. National Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004)(citations and quotation marks omitted). To analyze the sufficiency of claims brought under the ADA and RA, the Second Circuit employs a three-part test. *Id*. Plaintiff must demonstrate that (1) he is a "qualified individual" with a disability; (2) that the defendants are

subject to the ADA and Rehabilitation Act; and (3) that plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against, by reason of a plaintiff's disabilities. *Id*. at 85.

In order to satisfy the third prong as to whether there was discrimination, three theories of liability are plausible: "disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009). Defendants have a presumptive obligation to provide "reasonable accommodations" to individuals with disabilities. Consequently, a covered entity's failure to provide such accommodations will be sufficient to satisfy the third element. *See* 42 U.S.C. § 12182(b)(2)(a)(ii); *Powell*, 364 F.3d at 85. The question of whether a proposed accommodation is reasonable is fact-specific and must be evaluated on a case-by-case basis. *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999)

Title III of the ADA allows for injunctive relief, but not damages. *Powell*, 364 F.3d at 86. The Rehabilitation Act allows for the recovery of damages, provided that the plaintiff shows that the statutory violation resulted from "deliberate indifference" to the rights secured by the Rehabilitation Act. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d

8

98, 115 (2d Cir. 2001). Plaintiff must also show that defendants received federal funding in order to establish a violation under the RA. *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). Because the standards adopted by [Title III] are, in most cases, "the same as those required under the Rehabilitation Act," the Court considers these claims together. *Powell*, 364 F.3d at 85. (citation omitted).

Plaintiffs are "qualified individuals" with disabilities under the RA and ADA, (Compl. ¶¶ 29-31), and the QACC's programs and activities "are financed by Medicare and Medicaid among other federal funding programs." (Compl. ¶ 183.) Thus, the issues in dispute are whether plaintiffs have sufficiently stated that they have been discriminated against because of their disabilities and whether plaintiffs have failed to identify any reasonable accommodation that they requested but were denied because of the plaintiffs' disabilities.

**II. Disparate Impact**

Plaintiffs contend that they have pled sufficient facts to show disparate impact. (Pl. Opp. at 18-19.) In order to show disparate impact plaintiffs must demonstrate "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Tsombanidis v. W. Haven Fire Dep't*, 352

F.3d 565, 574–75 (2d Cir. 2003) (emphasis omitted), *superseded on other grounds by regulation as stated in Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 619 (2d Cir. 2016); *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016).

According to plaintiffs' complaint, as COVID cases began to rise in 2020, QACC began to implement instructions for residents with respect to "hygiene, safety isolation, or separation." (Compl. at ¶ 68.) The instructions were voluntary and the QACC did not implement a "protocol . . . for comprehensive testing or screening of residents or staff for cough, fever, and respiratory symptoms." (*Id.* at ¶ 69.) Nor did defendants "identify or isolate those residents who are particularly susceptible or vulnerable to COVID-19 because of their disabilities" (*Id.* at ¶ 70). Additionally, the facility failed to enforce social distancing among the residents who were "permitted to congregate in large groups and at close distances . . . often without the proper use of facemasks and without enforcement of social distancing." (*Id.* at ¶¶ 72-73). At the time the complaint was filed, there was also an "absence of protocol for prompt transfer to a hospital" and QACC staff were allowing residents to freely travel outside of the facility which put "residents with disabilities including mental illnesses at a particularly heightened risk because of their inability to comprehend the grave and urgent need for self-

quarantine." (*Id*. at ¶¶ 76, 79). These instructions, or lack thereof, are "outwardly neutral," as they are directed to all residents at QACC, thus plaintiffs have established the first prong of the disparate impact test. *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574–75 (2d Cir. 2003).

Defendants contend that plaintiffs have failed to demonstrate "a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Id*. Specifically, defendants argue that plaintiffs have not "identified members of a particular, clearly-defined protected group that are negatively affected by QACC's neutral policies." (Def. Mem. at 9.) Additionally, defendants note that plaintiffs have pleaded facts that impact all residents of QACC and that "without a comparative component, plaintiffs simply do not state a disparate impact claim." (*Id*. at 10.) Plaintiffs alternatively argue that there are two separate disabled groups at QACC, the Assisted Living Program ("ALP") residents and the psychiatric residents, and there is a "natural comparison group" which includes those residents who are not in either of the disabled categories. (Pl. Opp. at 19.) The court agrees with defendants that plaintiffs have not demonstrated a disparate impact.

"The basis for a successful disparate impact claim involves a comparison between two groups – those affected and

those unaffected by the facially neutral policy.  This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." *Wilson v. New York*, No. 15-CV-23, 2017 WL 9674497, at 15 (E.D.N.Y. Jan. 24, 2017) (internal quotation marks omitted), report and recommendation adopted, 2018 WL 1466770 (E.D.N.Y. Mar. 26, 2018).  "Oftentimes, disproportionate impact is demonstrated through the use of statistics." *Valdez v. Town of Brookhaven*, No. 05-CV-4323, 2005 WL 3454708, at 13 (E.D.N.Y. Dec. 15, 2005).

Plaintiffs have not alleged a plausible set of facts showing that defendants' facially neutral acts or practices caused significantly adverse or disproportionate impact on persons in either of the two allegedly disabled groups: residents in the assisted living program, or psychiatric residents.  The conduct of which plaintiffs complain – that defendants have not properly handled the COVID-19 outbreak at QACC – is a facility-wide issue with impacts on all residents.  The court agrees with defendants' observation that plaintiffs "repeatedly allege that COVID-19 threatens all residents of QACC," (Def. Mem. at 10), and that the allegations are a "broadside challenge to QACC's COVID-19 policies that impact everyone." (*Id*.)  Plaintiffs acknowledge that they have not specified "exactly how the members of each group are being

12

affected by COVID-19," (Pl. Opp. at 19), but it is unclear whether this information, if available, would even support plaintiffs' claim. Plaintiffs have combined all assisted living residents with every kind of disability into their proposed class. Statistical evidence on COVID-19's impact on those disabled residents and evidence pertaining to those non-disabled residents would likely not provide probative value nor show a disparate impact of the facility's policies on disabled residents because the proposed disabled class is so large and diverse. Because the complaint contains little to no facts rendering plausible plaintiffs' conclusory claim of a neutral policy that has a disparate impact on a protected group, plaintiffs' disparate impact claims under the ADA and RA against defendants are dismissed.

### III. Reasonable Accommodation

Defendants argue that plaintiffs have failed to identify any reasonable accommodation that is needed by reason of their disabilities. Under both the ADA and the RA, "a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take a meaningful part in public services.'" *McElwee v. Cty. of Orange*, 700 F.3d 635, 640-641 (2d Cir. 2012) (quoting *Powell*, 364 F.3d at 85, and citing 42 U.S.C. § 12112(b)(5)(A) (the term "discriminate" under the ADA

13

includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee")). "'A reasonable accommodation is one that gives the otherwise qualified plaintiff with disabilities meaningful access to the program or services sought.'" *Id.* (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003)).

Defendants primarily argue that plaintiffs have failed to state an ADA claim because plaintiffs did not allege that they notified the defendants of their disabilities, specified a requested accommodation, nor did plaintiffs explain why modification of the defendants' policy or practice was required prior to commencing this action. (Def. Mem. at 11; citing *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 466 (S.D.N.Y. 2012).) It is true that "notice of the alleged disability ... is an assumed prerequisite" of a Title III claim for failure to make reasonable accommodations. *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 466 (S.D.N.Y. 2012); *see also McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (listing notice as a required element of a failure to accommodate claim in an employment discrimination case). A "plaintiff must show that defendants had notice of her disability ... [and] has the initial duty to inform the [defendant] of a disability before

14

ADA liability may be triggered for failure to provide accommodations." *Thompson v. City of New York*, No. 98 Civ. 4725, 2002 WL 31760219, at 7 (S.D.N.Y. Dec. 9, 2002). Additionally, as the court noted in *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, "Title III's requirement that private entities make 'reasonable accommodations' for disabled individuals would be rendered meaningless if the entity had no basis for knowing (1) what accommodations the examinee was seeking, and (2) whether those accommodations were reasonable in light of the disability and the test." 848 F. Supp. 2d 460, 467 (S.D.N.Y. 2012). Plaintiffs have complied with the inherent requirement under Title III of notifying defendants of their disability, but nowhere in the complaint do plaintiffs mention notifying defendants prior to commencing this action of their requested accommodations. (*See generally* Compl.)

Plaintiffs reside at QACC because they "are elderly or dependent individuals with disabilities and associated care needs." (Compl. at ¶ 4.) The named plaintiffs' disabilities vary amongst them, and include schizophrenia, chronic and severe cardiovascular disease, and legal blindness. (Compl. at ¶¶ 103-105.) QACC is "one of the largest assisted living facilities in the State of New York." (Compl. at ¶ 9.) The residents of QACC receive assisted living benefits because they "[a]re medically eligible for nursing home care. However, their functional

ability . . . [is not] so limiting that they require nursing home care around the clock." (Compl. at ¶ 2.) It is plainly understood that in qualifying for assisted living and being residents at QACC, plaintiffs suffer from some type of disability. However, despite defendants being on notice of plaintiffs' disabilities, they were not on notice regarding plaintiffs' requested accommodations, which inherently invalidates the reasonable accommodation claim. *See Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 466 (S.D.N.Y. 2012).

Defendants further contend that "plaintiffs do not seek any reasonable accommodation that is connected to any particular disability." (Def. Mem. at 14.) Plaintiffs' proposed accommodations include "modifications of QACC's polices, practices, and procedures to ensure immediate and strict compliance with applicable regulations and guidelines from CDC, CMS, 42 C.F.R. § 483, and New York Department of Health governing nursing homes and assisted living facilities with regard to the control and prevention of COVID-19," along with the appointment of a Special Master "to help bring QACC's response to the coronavirus in line with the mandates of ADA and RA." (Pl. Opp. at 22-24.)

"The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field

16

with the non-disabled; it does not authorize a preference for disabled people generally." *Felix v. N.Y.C. Transit Auth.*, 324 F.3d 102, 107 (2d Cir.2003). The court agrees with defendants that plaintiffs have failed to articulate the nexus between the disabilities allegedly suffered by the QACC residents and the proposed accommodations.

In *Felix v. N.Y.C. Transit Auth.*, the plaintiff suffered from insomnia and asked for a workplace accommodation which would allow for her to not work in the subway because she was "terrified of being alone and closed in." 324 F.3d 102, 107 (2d Cir.2003). The court determined that "the impairment for which Felix seeks an accommodation does not arise because of the disability. If the requested accommodation addressed a limitation caused by Felix's insomnia, it would be covered by the ADA." *Id*. Similarly here, plaintiffs have failed to articulate a connection between all of the plaintiffs' collective disabilities and the accommodations sought. Mr. Schoengood is the only named plaintiff that suffers from a mental disability, which causes an "apparent lack of comprehension and self-awareness regarding the risk of COVID-19 infection and consequences." (Compl. at ¶ 75.) Conversely, Ms. Simpson and Mr. Roland appear to suffer from physical disabilities, and it is unclear how all of the plaintiffs' disabilities warrant similar accommodations *because* of their

disabilities, rather than all QACC residents warranting the same changes to the COVID-19 protocols at the facility. Therefore, plaintiffs' reasonable accommodation claims under the ADA and RA against defendants are dismissed.

## CONCLUSION

For the reasons set forth above, the plaintiffs' disparate impact and reasonable accommodation claims pursuant to the ADA and RA are dismissed. It is "well established that leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Burch v. Pioneer Credit Recovery, Inc*., 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of futility.") Amendment would be futile because of the broad nature of disabilities suffered by the proposed class and the failure to articulate a nexus between the disabilities and the reasonable accommodations requested. The Clerk of Court is respectfully directed to enter judgment in favor of defendants and close the case. **SO ORDERED.**

**Dated:** May 12, 2021
Brooklyn, New York

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York